**NORTHWEST AIRLINES, INC.,**
**Plaintiff,**

v.

**The AIR LINE PILOTS ASSOCIATION,**
**INTERNATIONAL, Defendant.**

**No. 4–70–Civ. 424.**

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 22, 1970.

---

1. Pages 93 and 94 containing these reports are barely legible. Efforts should be made to obtain a better copy on remand.

Henry Halladay and David A. Ranheim Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for plaintiff.

Edward M. Glennon, Lindquist & Vennum, Minneapolis, Minn., for defendant.

## MEMORANDUM

LARSON, District Judge.

On July 8, 1970, the clerical and other employees (hereafter BRAC) of Northwest Airlines (hereafter NWA) went on strike after exhausting all mandatory procedures required by the Railway Labor Act.

This is the third lawsuit in this Court arising out of that strike. In August BRAC sued NWA in the District of Columbia. In that action, which was transferred to Minnesota, BRAC asked for an injunction temporarily enjoining NWA from three claimed violations of the Railday Labor Act. This Court found NWA to be in violation in one respect and denied the other two requests.

The second lawsuit was brought by NWA against the machinists union (hereafter IAM). In the case of the machinists, on July 8, the day of the strike, NWA notified the 3,500 employees of IAM that they were laid off. Apparently before July 8 IAM had notified BRAC that it would honor BRAC's picket lines. On July 18 NWA notified 763 IAM employees to return to work on a seniority basis. About 100 reported to the NWA main base here and about 121 reported for work elsewhere in the system. In their agreement with NWA the machinists have a no strike clause.

In late September NWA sued IAM to enjoin it from interfering with NWA operations and from violations of the Railway Labor Act. The motion for a preliminary injunction was denied. On appeal, the Court of Appeals for this Circuit stated that the basic issue was whether the IAM because of the no strike provisions of its bargaining agreement retained the right to instruct its members to honor the picket lines of a sister union. The Court, after characterization as a "minor dispute," referred this issue to the Systems Adjustment Board and asked for a decision by December 11. It did not, however, compel IAM members to return to work.

The instant case originally arose on October 8, 1970, when the Pilots Association (hereafter ALPA) notified NWA that effective October 13 at 0501 CST NWA pilots would honor the BRAC picket line. There is not an explicit no strike clause in the ALPA-NWA collective bargaining agreement. On October 12 a hearing was to be held on NWA's request for a temporary restraining order. However, on the intervention of the Secretary of Labor, negotiations between BRAC and NWA were resumed and the pilots agreed to withhold their proposed action. After ALPA withdrew its notice to honor BRAC picket lines on October 13, there were no more proceedings in this Court until November 25.

On November 24 ALPA again notified NWA that it would honor BRAC picket lines, effective November 27 at 0501 CST. On November 25 NWA renewed its request for a temporary restraining order directing ALPA to cancel the November 24 notice. A hearing was held late on Wednesday, November 25, and after a quick review on Thursday morning of the applicable statutes and some Court decisions, a temporary restraining order was issued requiring a cancellation of the notice. The public interest in part required continuation of the flights over the Thanksgiving holiday weekend and

also the Court felt that it would need additional time at a hearing on the request for a preliminary injunction to explore the matter further. ALPA complied and continued flying.

The request by NWA for a preliminary injunction and the motion of the pilots to dissolve the temporary restraining order were consolidated for hearing and heard on December 2, 1970.

NWA has requested a preliminary injunction, generally asking that ALPA, its members, officers, etc., be enjoined from refusing to cross picket lines established by BRAC. It maintains that the duty to arbitrate contained in the "minor dispute" provisions implies, as a matter of law, a no strike clause in the collective bargaining agreement. NWA argues that the refusal to cross picket lines is a violation of the implied no strike clause which constitutes a "minor dispute" under the Railway Labor Act and hence must be submitted to the System Board of Adjustment pursuant to the compulsory arbitration of "minor disputes" provided by the Act. In addition, NWA alleges that Section 2 (First) of the Railway Labor Act creates an affirmative duty on the part of employees not to create an interruption in the operations of a carrier.

■ In determining whether the extraordinary relief requested by NWA should be granted, consideration must be given to four essential factors.

1. Has the plaintiff shown substantial probability of success on the merits?

2. Has the plaintiff shown irreparable injury?

3. Will the granting of a preliminary injunction substantially impair the interests of the other party to the proceedings?

4. How will the granting of an injunction affect the public interest?

In addition, there is the issue of whether or not the Norris-LaGuardia Act operates to deny this Court the jurisdiction to grant an injunction under these circumstances.

The Railway Labor Act is a scheme devised by Congress whereby disputes between common carriers under the Act and their employees can be resolved. If the disagreement is over wages, rules or working conditions, an elaborate procedure of negotiation and mediation is set up. If the dispute involves a grievance or a disagreement arising out of the interpretation or application of the collective bargaining agreement, resolution is achieved ultimately by an arbitral decision binding on both parties. The purpose of these provisions is to completely preclude a union from initiating a strike over grievances and disputes arising out of contract interpretation ("minor disputes") and in those situations where the dispute is over wages, hours and working conditions ("major disputes"), to require utilization of almost every conceivable method by which mutual agreement can be reached, before resorting to self-help.

■ The "Minor Dispute" provision of the Railway Labor Act manifestly presumes the existence of some underlying disagreement which has to be resolved and sets forth procedures for doing so without resort to a strike.

The situation before this Court, however, does not present an underlying dispute between ALPA and NWA over which ALPA in an attempt to achieve a favorable resolution has initiated a work stoppage. The situation presented involves the work stoppage itself as the very basis of the disagreement.

The Supreme Court of the United States has made it clear that a no strike clause will be implied where there is an obligation to arbitrate. Boys Market, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). NWA argues that such a duty exists as to all collective bargaining agreements subject to the Railway Labor Act by reason of the "minor dispute"

provisions of the Act. It must be remembered, however, that the duty to arbitrate under the Railway Labor Act follows the dispute. There is no duty to arbitrate until and unless there is a "minor dispute." As a result there can be no implied no strike clause until there is a "minor dispute." In the instant case it is the work stoppage itself which NWA claims constitutes the "minor dispute." There is, therefore, no duty to arbitrate, from which a no strike clause can be implied, until the work stoppage is commenced creating the "minor dispute." Hence the no strike clause and its violation arise out of the same act.

The circularity of the situation is not alleviated by characterizing the dispute as one over the right of NWA to order ALPA members to cross the picket lines. The whole basis of such an order is the existence of a no strike clause. Again, the only manner by which a no strike clause can be implied is through the "minor dispute" provision of the Railway Labor Act. There is, however, no "minor dispute" until such time as ALPA members refuse to comply with NWA's order and proceed to honor the picket line. Once again, the obligation to obey and the refusal to do so arise out of the same act.

The above situations can be contrasted with the one surrounding the IAM refusal to cross BRAC picket lines. The IAM-NWA collective bargaining agreement contains an express no strike clause. The IAM decision to honor BRAC picket lines clearly raises a colorable conflict with the provisions of the agreement. Although, as in the instant case, the work stoppage itself created the dispute, the corresponding duty not to engage in the stoppage pre-existed the violation.

The conceptual problem created by the circular situation presented in the instant case is complicated by the fact that the work stoppage is a strike only in a generic sense. ALPA is not involved in initiating a work stoppage in an attempt to compel a concession from NWA in a dispute ALPA has with NWA. Rather, ALPA is refusing to cross picket lines established as the result of an already existing strike, being legally conducted by other employees of NWA. Thus, although the form is the same, the substance is not. ALPA's action is supportive, not initiatory. The thrust of the Railway Labor Act, particularly the "minor dispute" provisions, is toward limiting the circumstances under which initiatory strike action can be taken by employees. This would be natural since supportive stoppages of the type involved in this action would be dependent upon the existence of picket lines arising out of an initiatory strike. It seems unlikely to this Court that Congress intended the "minor dispute" provision to operate as a no strike clause which prohibits a union from honoring picket lines established as a result of a legal strike under the Act. To do so would ascribe to Congress an intent not only to delay the ultimate use of the strike as an economic weapon but also to limit its effectiveness when eventually resorted to. The latter is to this Court an untenable position. This will be examined in more detail later in this memorandum.

To treat the situation before this Court as a "minor dispute" creates legal as well as conceptual problems. There is no express contract provision to be interpreted. If there is a no strike clause it will be by operation of the "minor dispute" provision of the Railway Labor Act—a statutory provision enacted by Congress. Interpretation of Federal statutes is reserved to the Federal Courts and Administrative Agencies. It is not an appropriate function of a labor arbitrator. Furthermore, the circular nature of NWA's argument creates the same conceptual problem alluded to above in a different context. In order to have an implied no strike clause to interpret, there must be a "minor dispute" to create a duty to compulsorily arbitrate. However, once the determination is made that the strike constitutes a "minor dispute" there is nothing left to arbitrate. As a "minor dispute," the strike must be enjoined. When the strike is enjoined

the basis of the "minor dispute" disappears. There is no obligation to arbitrate under the Railway Labor Act unless there is a "minor dispute." Therefore with the disappearance of the "minor dispute," the duty to arbitrate is extinguished. Since the no strike clause is implied from the duty to arbitrate, the no strike clause also dematerializes. The arbitrator has nothing left to interpret.

It could be argued that this creates a situation to be governed by United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. There the collective bargaining agreement contained a no strike, no lockout provision and had a grievance procedure providing for compulsory arbitration of differences arising between the company and union as to the meaning and application of the contract provisions. Matters which were "strictly a function of management" were specifically excluded from arbitration. The employer was contracting out work previously performed by employees while a number of employees were laid off ostensibly due to lack of work. The union sought to arbitrate the grievance but the employer refused, maintaining that the decision to contract work was strictly a function of management and hence nonarbitrable. Both courts below held for the employer. The Supreme Court reversed, holding that judicial inquiry must be strictly confined to whether the reluctant party agreed to arbitrate the grievance. The decision as to whether contracting out violated the contract was to be left to the arbitrator. This was necessary because with a no strike clause in the contract and the managerial function exception to the arbitration clause, it would be natural for the employer to characterize every single decision adversely affecting the employees as a "management function" and nonarbitrable. If the courts were to get involved in determining in every case whether the particular grievance fell within the exception or not, the arbitration clause, as the Court put it, "would be swallowed

up by the exception." 363 U.S. at 584, 80 S.Ct. at 1354. Every issue would at least preliminarily be in court and the arbitration procedure would not be utilized.

Although at first blush it appears that *Warrior* might be applicable to the present situation, a closer examination demonstrates to this Court that it clearly is not. In *Warrior* the determination was to be made by the arbitrator whether or not contracting out came within the arbitration clause or the exception. Both provisions were contained within the four corners of the contract. The arbitration clause covered "the meaning and application of the provisions of this Agreement." The Court simply determined, in light of this, that any dispute over what constituted a managerial function was one involving "the meaning and application" of a provision contained within the collective bargaining agreement. The Court left to the arbitrator the threshold decision as to whether or not the dispute came within the jurisdiction of the arbitration clause or whether it was excluded pursuant to *another contract provision*. In the case before this Court we have a vastly different situation.

The duty to arbitrate is not explicit but is in the contract by implication, being derived from the language of the Railway Labor Act. Under the Railway Labor Act the duty to arbitrate with its attendant implied no strike clause follows the dispute. In other words, there first has to be a minor dispute; then there arises a duty to arbitrate. This creates a series of problems.

First of all, there is the conceptual problem once again. Since the implied no strike clause arises only upon a determination of a minor dispute, there is no no strike clause within the agreement for the arbitrator to interpret unless first of all there is a determination that the strike constitutes a "minor dispute." If that determination is made, then there is nothing left to interpret since the strike must then be enjoined with the results described previously. In *War-*

*rior,* the arbitration clause, the jurisdiction of which was in question, was in the agreement itself. Here it is not. More importantly, the determination critical to the existence and operation of the clause —namely, that there is a minor dispute— extinguishes not only the jurisdictional issue, but the entire dispute.

Secondly, since the clause to be interpreted does not arise out of the agreement between the parties but out of the operation of Federal labor legislation, it is not a question of intent of the parties but of the intent of Congress. This is clearly a question for the Courts and not for the arbitrator. Putting aside the question of the institutional appropriateness of the arbitrator, there is the practical consideration of consistency. It is entirely possible, if the *Warrior* approach were followed, that different arbitral bodies would differently decide the question of whether a refusal to cross picket lines in the absence of an *express* no strike clause is prohibited by an *implied* no strike clause arising out of the "minor dispute" provision of the Railway Labor Act.[1] This may not be of any importance, however, because this Court's reading of *Warrior* indicates to it that judicial inquiry is to be made as to whether there was intent to submit to arbitration. In the instant case the equivalent issue to be decided by the Court is the intent of Congress as to the characterization of a refusal to cross picket lines as a "minor dispute." This follows from the fact that the only basis for an obligation to arbitrate under the Railway Labor Act arises out of a "minor dispute." Hence, there must be a "minor dispute" in order to have an arbitration clause for the arbitrator to determine the jurisdiction of. However, a determination of that question in the af-

firmative by the Court eliminates the necessity of a jurisdictional inquiry by the arbitrator because a "minor dispute" is by definition one which must be arbitrated.

■ This is not to say, however, that *Warrior* does not have any efficacy insofar as the Railway Labor Act is concerned. A clause exempting management functions from dispute by the union could create a situation exactly parallel to *Warrior.* The union could maintain that some administrative action by the employer violated a provision of the contract—for instance, the right to bid jobs by seniority. If the employer maintained that the action came within purview of the exclusion clause, it would be consistent with the Railway Labor Act and *Warrior* for the Court to refer the dispute to a System Board of Adjustment which would initially determine whether the dispute was arbitrable. If the Board decided that the dispute was not a "major" but a "minor" dispute, but that it still was not arbitrable because it came within the exclusion, a strike by the union over the dispute would be clearly enjoinable by the courts. It is apparent from the foregoing that this Court feels it is the Court that should determine whether or not Congress intended a refusal to cross picket lines to be characterized as a "minor dispute" arising out of an implied no strike clause. This Court is inclined to believe that Congress had no such intent. This inclination is not derived solely from the circularity of the arguments made to the contrary, but results largely from an examination of the Railway Labor Act and recent Supreme Court decisions.

Although Congress clearly intended, when it enacted the Railway Labor Act, to delay utilization of the strike as a

---

1. *Cf.* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). The determination of the permissible range of self help "cannot be left to the laws of the many States, for it would be fatal to the goals of the Act" if conduct were prohibited by state laws "even though in furtherance of the federal scheme. *The needs of the subject matter manifestly call for uniformity.*" (Emphasis supplied.) 394 U.S. at 381, 89 S.Ct. at 1117, citing in part from International Association of Machinists v. Central Airlines, Inc., 372 U.S. 682, 691–692, 83 S. Ct. 956, 10 L.Ed.2d 67 (1963).

means of obtaining economic gains, there is no indication that there was any intent to diminish its effectiveness once resorted to. An examination of the structure of the Act demonstrates that diminishing the effectiveness of the strike would be at cross purposes with the "major dispute" bargaining provisions in the Act. Congress could have substituted arbitration for the negotiation-mediation provisions set forth for "major disputes" just as it did for "minor disputes." Congress chose not to. There is no explicit limitation on the conduct of a strike once negotiations and mediation pursuant to the Act have failed to resolve the issues. As a practical matter it is the existence of the right to ultimately conduct an effective strike which creates employee bargaining power during the negotiation-mediation process. It is only the awareness that he may be the object of an effective economic strike if resolution of issues is not achieved by mutual agreement that compels an employer to bargain seriously with the union. Furthermore, it is highly unlikely that Congress would abrogate the union's right to strike without providing an alternative method to compel resolution of issues. Within the Railway Labor Act itself there is evidence that this is true. The 1926 Act contained the distinction between "major" and "minor" disputes. However, it did not provide for compulsory arbitration of the latter. Congress in 1934 because of threatened disruptions in carrier service caused by "minor disputes" withdrew the right to strike in that context. However, it substituted, for the right to exercise economic coercion, the decision making process of a neutral body binding on both parties to the dispute.

The possibility is remote at best that Congress intended the "minor dispute" provisions to be interpreted in a manner that would substantially reduce the effectiveness of a legal strike over a "major dispute" without providing an alternative method for final settlement of the dispute. An employer being aware of the inability of the union to mount an ef-

fective strike without the support of sister unions might be tempted to wait for the strike and break the union. *Cf.* Brotherhood of Railway & S. S. Clerks v. Florida E. C. Ry., 384 U.S. 238, 245, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1965) (hereinafter F.E.C.).

The Supreme Court's approach has clearly been to interpret the Act in order to allow free play of economic power once self-help is reached. This has been carried to the extent of holding inapplicable sections of the Railway Labor Act which if enforced once the point of a strike had been reached would have seriously impaired the carrier's right to engage in self-help. *F.E.C., supra.* In another case the Court permitted picketing by the striking union which arguably would have been proscribed under the NLRA as secondary in nature because Congress did not clearly indicate that secondary picketing was illegal under the Railway Labor Act. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U. S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (hereinafter *Jacksonville*).

In the *F.E.C.* case the nonoperating unions made a demand for a general wage increase and notice requirements in the event of layoffs or job abolitions. The claim was processed through the mandatory procedures of the Railway Labor Act. When F.E.C. refused to accept a compromise settlement proposed by a Presidential Emergency Board, the nonoperating unions struck. The operating unions refused to cross the picket lines. It should be noted in this regard that the Supreme Court did not express any concern that the action of the operating unions in honoring the nonoperating union's picket lines resulted in the creation of a "minor dispute" or otherwise violated any duty imposed by the Railway Labor Act.

After a short shutdown F.E.C. resumed operations, using supervisory personnel and replacements to fill the jobs vacated by the strikers and those operating employees who refused to cross picket lines. Individual agreements were made with these workers, the terms of

which differed substantially from those contained in the collective bargaining agreements with the various unions. Thereafter F.E.C. proposed to abolish all the existing agreements and substitute a new one which would result in substantial departures from the terms of the old one. After a series of abortive negotiations and an attempt at mediation, F.E.C. unilaterally established yet another agreement and proceeded to operate under it until 1964.

It was then that the Government brought suit against F.E.C. charging that the unilateral changes by F.E.C. in the bargaining agreements was a violation of Section 2 (Seventh) of the Railway Labor Act, which provides:

> "No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act."

Section 6 of the Act initiates the mandatory negotiation-mediation machinery for "major disputes." The Supreme Court ruled that F.E.C. when the point of self-help was reached could not be bound by Section 2 (Seventh) of the Railway Labor Act. In regard to that section the Court said:

> "It is, * * * argued * * * that each of these issues [The unilateral changes by F.E.C. in the terms of the collective bargaining agreements] must run the same gantlet of negotiation and mediation, as did the pay and notice provisions that gave rise to this strike. The practical effect of that conclusion would be to bring the railroad operations to a grinding halt. * * * If, therefore, § 2 Seventh is applicable after a lawful strike has been called and after lawful self-help has been invoked by the carrier, *the right of self-help might well become unilateral to the workers alone, and denied the carrier.*" (Emphasis supplied.) 384 U.S. at 245–246, 86 S.Ct. at 1424.

The argument has equal force in the instant case, especially when one considers the fact the "minor dispute" provisions sought to be invoked result in serious conceptual problems and require the questionable practice of permitting an arbitral body to interpret Congressional legislation if applied in the manner NWA proposes.

The *Jacksonville Terminal Case* arose out of the same labor dispute as the *F. E.C. Case.* After F.E.C. unilaterally changed the terms of the collective bargaining agreements, picketing commenced at locations where F.E.C. carried on operations. This included the terminal company which was utilized by other railroads also. A Federal District Court enjoined the picketing of the terminal except at a special gate set aside for F.E.C. employees. The Court of Appeals for the Fifth Circuit reversed, holding that the Norris-LaGuardia Act barred issuance of a Federal injunction. Brotherhood of Railroad Trainmen v. Atlantic C. L. R. R. Co., 362 F.2d 649 (5th Cir. 1966). This was done even though the employees honoring the picket lines were not employees of F.E.C., the struck employer, but of other railroads who also used the facilities of the terminal. An equally divided Supreme Court affirmed Brotherhood of Railroad Trainmen v. Atlantic C. L. R. R. Co., 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966).

While the above litigation was pending in the Federal courts, the terminal company obtained injunctive relief from a Florida State court. It was this injunction which eventually culminated in the *Jacksonville* decision.

The State trial court found that general picketing would result in virtually a complete shutdown of the terminal company's activities, would cause serious economic damage to the State, and that it constituted an illegal secondary boycott and was proscribed under various other State laws. The Supreme Court of the United States, speaking through Mr. Justice Harlan, reversed, holding that although the Florida courts may have had

jurisdiction over the litigation, the application of State law was limited by the nationwide Congressional policy contained in the Railway Labor Act's scheme for resolving major disputes. Since peaceful primary picketing incident to a lawful strike is protected activity under the National Labor Relations Act and there is no basis for distinguishing picketing under the Railway Labor Act, it is protected activity under the Railway Labor Act. The Court went on to say in discussing the secondary nature of the picketing:

"[W]e have been furnished by Congress neither usable standards nor access to administrative expertise in a situation where both are required. In these circumstances there is no really satisfactory judicial solution to the problem at hand. *However, we conclude that the least unsatisfactory one is to allow parties* who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute to employ *the full range of whatever peaceful economic power they can muster,* so long as its use conflicts with no other obligation imposed by federal law." (Emphasis supplied.) 394 U.S. at 392, 89 S.Ct. at 1123.

NWA obviously contends that ALPA's refusal to cross picket lines is in violation of an implied no strike clause arising out of the "minor dispute" provisions of the Railway Labor Act and hence within the scope of the exclusion contained at the end of the portion of the opinion cited above. This notion is quickly dispelled by examining the Court's discussion earlier at page 389 of the opinion, 89 S.Ct. at 1121, where it said:

"In Local 761, International Union of Electrical Radio & Machine Workers, A.F.L.-C.I.O. v. NLRB [366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592], for example, we noted that striking employees could picket at a gate on the struck employer's premises which was reserved exclusively for employees of the secondary employer, *to induce those employees to refuse to perform work for their employer* which was connected with the struck employer's normal business operations."

█ Here there was clear acknowledgment of the right to appeal to secondary employees to withhold services connected with the struck employer's operations. There can be no argument as to the right to make that appeal to primary employees at the primary situs of the struck employer, which is the situation in the instant case. Although the Court was discussing the holding in a case decided under the NLRA, it ultimately held in *Jacksonville* that a similar secondary appeal could not be enjoined under the Railway Labor Act. If an appeal for support to secondary employees can legitimately be made under the Railway Labor Act, certainly there cannot be a serious assertion made that an appeal to employees of the primary employer would be proscribed. The right to make that appeal must obviously carry with it the corresponding right of the non-striking employee to respond. It is unreasonable to attribute to the Supreme Court the contrary position. The Court would hardly recognize the right of the striking employees to make such an appeal if the response thereto by the non-striking employees was prohibited by the Railway Labor Act.

It has been represented to this Court that NWA's construction of the Railway Labor Act will simply delay—not permanently eliminate—the right to honor a sister union's picket line. This contention ignores the conceptual and legal problems discussed above attendant to treating a refusal to cross picket lines as a "minor dispute." However, putting those considerations aside, it was precisely this argument that the Supreme Court rejected in the *F.E.C.* case. Had the Supreme Court held Section 2 (Seventh) applicable it would not have permanently foreclosed F.E.C. from making the changes it sought to make; it would simply have delayed their implementation until the mandatory procedures of the Act were complied with. The Supreme Court recognized that the mere

delay may create such an imbalance in economic power as to make the right to self-help completely one-sided.

The Supreme Court decided in *F.E.C.* not to apply Section 2 (Seventh) because to do so would interfere with the employer's right to self-help. This was done even though the provision was plainly applicable on its face and it could have been enforced without creation of the conceptual problems associated with the instant case. The Court recognized in *Jacksonville* the right to appeal to secondary employees to honor picket lines along with the corresponding right of the secondary employees to respond to that appeal. These decisions mandate against any construction of the Railway Labor Act's "minor dispute" provision which would destroy or limit the right of primary employees to respond to a picket line established pursuant to a legal strike. A decision to the contrary would diminish the effectiveness of the striking union's self-help efforts and severely affect the bargaining power of those unions who need it most—the ones made up of unskilled and semi-skilled workers. The practical effect would be to discriminate in favor of that class of unions which has the capacity by virtue of possessing critical skills to close down an employer without the support of other employees.

■ NWA's second argument is based on Section 2 (First) of the Railway Labor Act.

> "*It shall be the duty of all carriers, their officers, agents, and employees* to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and *to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.*" (Emphasis supplied.)

NWA maintains that this provision of the Act imposes an affirmative duty on the parties to resolve all labor disputes regardless of their origin without interruption to the operations of the carrier involved.

This position comes perilously close to making it illegal as a matter of law for employees under the Railway Labor Act to conduct an effective strike. If the honoring of picket lines will effectively shut down the carrier, the position of NWA is that such an action must be enjoined as a violation of a positive duty imposed by Section 2 (First) of the Act. However, this reasoning seems equally applicable if the pilots rather than BRAC were involved in the underlying "major dispute." Would NWA then maintain that ALPA has an obligation to conduct an ineffective strike, that the pilots could not completely withhold their services because to do so would involve an interruption of carrier service? It is impossible for this Court to assume such a posture in light of the prior discussion concerning the Act and its interpretation by the Supreme Court.

An exception carved out for the union that has the "major dispute" with the employer would appear to this Court to be a senseless one. It would permit violation of a duty which NWA claims controls all other work stoppage fact situations, including the instant one, and would accomplish nothing except to discriminate in favor of those unions which have the capacity to shut down an employer without the aid of sister unions. There is no sound policy reason to create disparate bargaining power, as a matter of law, between different classes of employees under the Act.

NWA's interpretation of the operative effect of Section 2 (First) is totally inconsistent with the *Jacksonville* case. The Supreme Court accepted the findings of the Florida trial court that the picketing of the terminal would cause a cessation of terminal business and cause serious economic damage to the State. Despite the fact that the picket lines appealed to secondary employees, the Court said of

the right of the employees to conduct the strike:

> "Whether the source of this right be found. in a particular provision of the Railway Labor Act or in the scheme as a whole, it is integral to the Act. *State courts may not enjoin a peaceful strike by covered railway employees, no matter how economically harmful the consequences may be.*" 394 at 384–385, 89 S.Ct. at 1119 (Emphasis supplied.)

Obviously this applies equally to the Federal courts. The Court went on:

> "The Court has consistently held peaceful primary picketing incident to a lawful strike to be protected conduct under the National Labor Relations Act. 'Picketing has traditionally been a major weapon to implement the goals of a strike,' [citation omitted] and 'it is implicit in the Act [NLRA] that the public interest is served by freedom of labor to use the weapon of picketing.' [citation omitted]. *We see no possible grounds for distinguishing picketing under the Railway Labor Act. Peaceful primary strikes and picketing incident thereto lie within the core of protected self-help under the Railway Labor Act.*" 394 U.S. at 385–386, 89 S. Ct. at 1119. (Emphasis supplied.)

As previously pointed out, the right to make an appeal by picketing would hardly be protected by the Supreme Court if the response to that appeal (refusal to cross the picket lines) was prohibited.

The right to honor a picket line is not an immutable principle of law nor a clearly protected constitutional right. Congress has the power to take it away. However, in the Railway Labor Act, Congress incorporated the right to strike into a scheme of labor legislation and it is apparent that the viability of the bargaining procedure in that scheme rests to a large extent on the knowledge of the parties that it will be an effective strike when ultimately resorted to. Under these circumstances the Courts should not place any limitation on peaceful conduct of strikes absent a clear and unequivocal indication by Congress that they should do so.

In this regard Section 10 of the Railway Labor Act provides that a special Presidential Emergency Board may be created by the President if in the judgment of the Mediation Board a dispute threatens "to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service." The National Mediation Board did not make that judgment in the instant case, and it is no argument to say that at the time the NWA–BRAC dispute reached the point of self-help the Board did not realize that ALPA would honor the picket lines. There was no reason to assume that they would not and on the basis of the *Jacksonville* decision there was nothing to make the Board think that ALPA could not do so. If Congress had intended Section 2 (First) to have the effect NWA seeks to attribute to it—a flat prohibition against shutting down a carrier or interrupting commerce —why is Section 10 in the Act? Does it provide the machinery for determining when there exists an interruption of commerce so as to make Section 2 (First) operative? That does not appear to be the case. Section 10 does not refer back to Section 2 (First) nor does it contain a provision for compulsory arbitration of the unresolved "major disputes."

Section 10, it should be noted, does not create a prohibition against strikes. It merely delays, for an additional sixty days, the resort by the parties to self-help. Although the President has the power to call the Emergency Board, he is not vested with the power to compel arbitration or prohibit a strike over major disputes. The latter two objectives can only be achieved by an act of Congress.

Section 10 provides the machinery for bringing to the attention of Congress and the executive branch those instances in which a strike might be particularly disruptive to interstate commerce. However, Congress reserved the ultimate power to respond to interruptions in interstate commerce to itself and the executive

branch. It is inconsistent with that position for Congress to create in Section 2 (First) a flat prohibition against all strikes that interrupt commerce or the operations of a carrier without prior Congressional consideration.

This view of the role of Section 2 (First) is reinforced by the fact that Congress has taken *ad hoc* action in the past. It has enacted special legislation to settle railway disputes so as to avoid a strike. This was a peculiar action indeed if in the opinion of Congress a pre-existing prohibition against crippling strikes was embodied in Section 2 (First) of the Railway Labor Act.

Thus far this Court has determined that ALPA's refusal to cross the picket lines established by BRAC is not prohibited by any policy contained in Section 2 (First) of the Railway Act nor can it be enjoined by characterizing it as a "minor dispute." This still leaves the questions of what it is and what approach can be utilized to determine the legality of the action.

NWA contends that if the strike is not a "major" or a "minor dispute" but some other kind of dispute and for that reason cannot be enjoined, the Court is opening the door to a strike for any reason or no reason at all, provided the strike is called over a dispute which is not referable to a System Board of Adjustment or is not called during the pendency of negotiations pursuant to a "major dispute" under the Act. This contention can be answered in several ways.

First of all, at least insofar as a strike for no discernable reason at all is concerned, the argument is *reductio ad absurdum*. It defies common sense to anticipate that a union will conduct a strike that seeks to achieve nothing at all.

Secondly, let us assume that a refusal to enjoin ALPA in this case created a possibility of the problems envisioned by NWA. Even if that were true, its proposed interpretations of the Railway Labor Act, both of which place a severe strain on the entire collective bargaining fabric contained in that enactment, are

hardly the most appropriate solution to the problem.

Finally, the situation before this Court does not involve an initiatory strike by ALPA over "any issue" but is an expansion of an already existing strike over a "major dispute" being legitimately conducted by BRAC after exhausting all mandatory procedures required by the Railway Labor Act in the event of a "major dispute." Hence the work stoppage proposed by ALPA is arguably part and parcel of the BRAC dispute and its legality is governed by the legality of the initiatory strike by BRAC. This brings us to the approach which to this Court appears to be the most sensible one when dealing with a refusal to cross picket lines.

■ Obviously, if there is a refusal to cross picket lines, there must be some picket lines to honor. It is the legitimacy of the strike underlying those picket lines that should be examined to determine whether or not honoring of the picket lines is permissible. In other words, if the underlying strike is a legal strike, pursuant to a "major dispute" any refusal to cross those picket lines should be treated as concerted activity arising out of that legal strike and hence unenjoinable under Section 4 of the Norris-LaGuardia Act. See Northwest Airlines v. Transport Workers Union, 190 F.Supp. 495 (W.D.Wash.1961).

■ It is easy to identify a situation involving a refusal to cross picket lines. There is ordinarily no difficult subjective determination to be made as to whether the action constitutes a refusal to cross picket lines or constitutes some other kind of action. The underlying dispute out of which the picketing arose is also usually identifiable. Oftentimes, in fact, there may already have been a judicial determination as to the legality of the underlying strike. Obviously ALPA can bargain away its right to participate in this manner in a legitimate strike by a sister union by inserting an appropriate clause in the collective bargaining agreement just as they could bar-

gain away their ultimate right to strike over a "major dispute." When this is the case there is a colorable "minor dispute" over the contract provision and an injunction would be in order until a System Board of Adjustment determined the scope of that *specific* contract provision.

■ A brief discussion should be made as to the applicability of the Norris-LaGuardia Act in light of the conclusions of this Court. It has been determined that:

1. The refusal by ALPA to cross BRAC's legal picket lines is concerted activity arising ultimately out of the "major dispute" underlying the strike by BRAC.

2. Section 2 (First) of the Railway Labor Act cannot be interpreted to create a flat prohibition of any action which will interfere with carrier service.

3. The refusal by ALPA to cross BRAC picket lines, arising out of a legitimate strike over a "major dispute" does not create a "minor dispute" within purview of the Railway Labor Act absent a specific no strike clause in the ALPA collective bargaining agreement with NWA. To consider the refusal as such would greatly diminish the effectiveness of the legitimate strike, a result at cross purposes with the "major dispute" provisions of the Railway Labor Act and inconsistent with recent Supreme Court cases interpreting the Act.

There is no question that there must be an accommodation of Norris-LaGuardia and the Railway Labor Act. Brotherhood of Railroad Trainmen v. Chicago R.

& I. R. R., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). This Court's findings establish that ALPA's refusal to cross BRAC picket lines was not prohibited by any provision or provisions of the Railway Labor Act. Furthermore, it found that to enjoin such activity would interfere with the effectiveness of the procedure established by the Act to deal with "major disputes." Under such circumstances the Norris-LaGuardia Act removes the jurisdiction of this Court from enjoining ALPA from honoring BRAC picket lines.

Implicit in this ruling is the disposition of two of the four major factors ordinarily considered by a Court in granting equitable relief—probability of success on the merits and effect on the public interest.[2]

### SUCCESS ON THE MERITS—

The plaintiff has not shown substantial probability of success on the merits. As a matter of fact, there is a high degree of probability that there is no merit to either of NWA's contentions.

### EFFECT ON PUBLIC INTEREST—

■ Obviously, if ALPA's refusal to cross the picket lines results in a complete shutdown of NWA's operations it will create a severe inconvenience to the public. However, the short-term convenience of the public should not be confused with its interest. The latter manifests itself in many ways. Included are the benefits which flow from maintaining the integrity of the collective bargaining provisions of the Railway Labor Act or, for that matter, in the adherence by the Courts to the congressional policy contained in the Norris-LaGuardia Act which reflects a desire to have the Courts refrain from interfering with the con-

2. The other two factors—existence of irreparable injury and whether there is any substantial impairment of the interests of the other party—are not of particular importance. Both are invariably present in any situation where a request is made to enjoin a strike and generally cancel each other out. In the instant case the granting of an injunction will undoubtedly impair the interests of ALPA and its members, particularly those member pilots who have not worked for several months as a result of the strike. Conversely, it is very likely NWA would suffer some irreparable damage if the injunction were not granted, although it is a little more difficult to evaluate in this case since there is no indication as to how much NWA is receiving in mutual aid payments from other air carriers.

duct of strikes except under certain specified conditions. The existence of the Emergency Board provision in Section 10 of the Railway Labor Act, coupled with the fact that whenever it has appeared necessary to do so in the public interest Congress has taken steps to abrogate the collective bargaining provisions of the Act, evidences to this Court that the decision as to what public interest justifies compromising Federal labor policy as embodied in the Railway Labor Act clearly lies with Congress, not the Courts.