**UNITED TRANSPORTATION UNION, an Unincorporated Labor Union, as Representative of a Class of Operating Railroad Personnel, Plaintiff-Appellant,**

v.

**GEORGIA RAILROAD, Defendant-Appellee.**

**No. 71-1925.**

United States Court of Appeals, Fifth Circuit.

Dec. 14, 1971.

Ainsworth, Circuit Judge, dissented and filed opinion.

Joe H. Bynum, Jr., T. J. Lewis, Jr., Atlanta, Ga., for plaintiff-appellant.

William H. Major, Ralph G. McCallum, Jr., Atlanta, Ga., for defendant-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

BELL, Circuit Judge:

This action was brought by the United Transportation Union under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., seeking a preliminary injunction to enjoin an alleged unilateral change in working conditions by the Georgia Railroad in violation of the status quo provisions of the Act, 45 U.S.C.A. §§ 156, 160. The district court, 323 F.Supp. 187, denied the injunction on the basis that the change involved did not constitute a change in working conditions subject to the status quo provisions of the Act. We agree.

In January 1971, the railroad posted a bulletin purporting to abolish certain crew assignments and establishing new crew assignments with respect to specified trains. Under these changes, insofar as they are in question here, the terminal for the two operating crews would be moved from Augusta, Georgia to Camak, Georgia—a distance of 47 miles. The crews had been assigned to trains Nos. 30 and 31 which operated between Augusta, Georgia and Macon, Georgia. As changed, the trains would operate only between Camak, an intervening point, and Macon.

The issue involved is complicated by the fact that the parties to this suit are involved in negotiations at the national level between carriers represented by the National Railway Labor Conference and the Eastern, Western, and Southeastern Carriers Conference Committees and certain of their employees represented by plaintiff union and other employee unions.

In October 1969, the "major disputes" settlement provisions of the Railway Labor Act were set into operation when plaintiff union notified the Georgia Railroad through a § 6 notice, 45 U.S.C.A. § 156, of intended changes in agreements affecting rates of pay, rules, and working conditions. The railroad made § 6 counter-proposals, including one to "Establish a rule to provide that . . . the carrier shall have the right to establish, move, consolidate, and abolish crew terminals. . . ." Since these notices involved issues already pending in national negotiations, the matters asserted in the notices were referred for national handling by the parties.

It developed that the emergency board appointed pursuant to 45 U.S.C.A. § 160 was unable to effect a settlement on the pending issues within the 30 day period provided for in § 10 of the Railway Labor Act, 45 U.S.C.A. § 160, and Congress responded with the passage of Public Law 91–541, 84 Stat. 1407 (Dec. 9, 1970), which extended the status quo provisions of § 10 with respect to the dispute. Thus, no changes could be made by the parties to the controversy "in the conditions out of which the dispute arose". 45 U.S.C.A. § 160 as modified by Public Law 91–541, supra. *See* 1 U.S.Code Cong. & Admin.News, p. 1641 (1970); 3 U.S.Code Cong. & Admin. News, p. 4879 (1970).

The primary argument urged by the union on this appeal is that the relocation of crew terminals from Augusta to

Camak constitutes a change in working conditions contrary to the provisions of § 10, supra, as extended by Public Law 91–541. In support of this argument, the union maintains that the railroad's own § 6 notice of November 1969 indicates that the location of crew terminals was one of the working conditions intended to be changed and therefore subject to the status quo provisions of the act. The union thus urges that the district court erred in failing to enjoin the proposed change in crew terminals from Augusta to Camak.

The district court pointed out that the railroad's notice in literal terms was broad enough to embrace the work assignments in question. However, the substance of the court's findings was that the notice, in view of undisputed past work assignment practices, was not to be construed to include the subject matter of terminals for assigned crews as distinguished from unassigned crews.

We conclude from a careful examination of the record that the district court was not in error. It was conceded by the union that for assigned crews the terminal is the tie-up or layover point and that the changes involved here involve only assigned crews. The record further reflects a long practice of moving the tie-up or layover point for crews from time to time from Camak to Augusta and Augusta to Camak.

It is fair to say, however, that the employees were never pleased with Camak as a terminal point but the railroad, nevertheless, on occasion used it as a tie-up or layover point. The union points out in its complaint that the working agreements between the parties provide that "the home terminal for crews in unassigned service shall be Augusta, and for crews in assigned service the layover or tie-up point is their terminal." The crews in issue are in assigned service and it is undisputed that Camak under the circumstances presented is a layover or tie-up point.

We conclude that there is ample evidence to indicate that the designation of tie-up or layover points as the terminal for assigned crews was not a subject of prior dispute between the union and the railroad but was a matter reserved by practice if not by contract to the railroad. It was therefore not included in the railroad's § 6 notice of November 1969.

The union's reliance upon Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 1969, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325, in asserting a contrary position is misplaced. Granted, the facts of *Shore Line* are similar to those presented here, but with some important exceptions. In that case, the court noted that "the railroad's establishment of the [outlying] assignments arose at a time when actual working conditions did not include such assignments." 396 U.S. at 154, 90 S.Ct. at 301. Furthermore, the assignments in *Shore Line* had not "occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." Id. The record here is to the contrary. See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, supra, 396 U.S. at 154, 90 S.Ct. 294; cf. United Transportation Union Local Lodge No. 31 v. St. Paul Union Depot Co., 8 Cir. 1970, 434 F.2d 220, cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324.

We conclude that since the change involved in this case is not embraced by the Railroad's § 6 notice of November 1969, the district court did not err in denying the injunction.

Affirmed.

AINSWORTH, Circuit Judge (dissenting):

In my view, the conclusion reached by the majority in this case defeats one of the central objectives of Congress in its passage of the Railway Labor Act (45 U.S.C. § 151 et seq.), namely, that the status quo be maintained between labor and management, the union and the railroad here, while a "major dispute" be-

tween the parties is being resolved in accordance with the terms of the Act.

There has been a long history of strife and dispute between the union and the railroad about the latter's attempt to change the home crew terminal from Augusta to Camak, a distance of 47 miles. The crews live in Augusta, the home terminal. They must, therefore, drive 47 miles to work, and 47 miles back home. Camak is a community of approximately 100 people—there is no public transportation available, no rooming house or motel, with a single cafe which is open only 8 hours per day, closing at 4 p. m. There are a Coca Cola machine and a cracker and candy bar machine in the agent's office.

The railroad's unilateral change of the home crew terminal from Augusta to Camak, was a change in working conditions, not authorized by the collective bargaining agreement, and brought about a major dispute. The railroad's action thus violated the specific provision of the Railway Labor Act, Section 2, Seventh (45 U.S.C. § 152), Section 6 (45 U.S.C. § 156), and Section 10 (45 U.S.C. § 160), as extended by P.L. 91–541, 84 Stat. 1407.

Prior to the change of home crew terminal, the parties had each served Section 6 (45 U.S.C. § 156) notices on the other relative to proposed changes in the agreements. One of the changes proposed by the railroad was one allowing it to move crew terminals, the identical issue involved here. Without waiting for a resolution of its proposal, the railroad went ahead and made the change on its own—unilaterally.

This case is indistinguishable in principle from Detroit & Toledo S. L. R. Co. v. United Transp. U., 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed. 325 (1969). It cannot properly be decided by trying to alter the fact—made abundantly clear by the record—that the change which the railroad made is a change of home crew terminals, not a mere designation of a new tie-up or layover point. In clear and unequivocal language, the railroad's

bulletin of January 15, 1971, states that Camak will become "home terminal." Testimony of the railroad witness that this was mere "mis-naming" is unconvincing and an attempt to obscure the real issue, when scrutinized in light of all the circumstances and past history of this recurring controversy.

Thus, the railroad's unilateral action, in the face of its own Section 6 notice, should have been enjoined and the status quo maintained, until the orderly processes of the Railway Labor Act could have been allowed to function.

I would reverse and remand for entry of an appropriate order restoring the status quo. I, therefore, dissent.