**REA EXPRESS, INC., Plaintiff-Appellant,**

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, et al., Defendants-Appellees.**

No. 71–2212.

United States Court of Appeals, Fifth Circuit.

May 1, 1972.

Charles Kelso, Atlanta, Ga., Arthur M. Wisehart, New York City, for plaintiff-

appellant; Peter G. Wolfe, New York City, Fisher & Phillips, Atlanta, Ga., of counsel.

James L. Highsaw, Washington, D. C., David J. Fleming, New York City, Joseph Jacobs, Atlanta, Ga., William J. Donlon, Gen. Counsel, Brotherhood of Railways, etc., Rosemont, Ill., for defendants-appellees.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This action involves a labor dispute between Railway Express, Inc. (REA), an express carrier governed by the Railway Labor Act, 45 U.S.C. § 151 et seq., and its operating personnel represented by the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC). The dispute concerned proposed changes by REA in its trucking operations. During the course of their controversy the parties reached a seeming impasse, and REA unilaterally instituted the proposed changes in its own favor. In response BRAC called a strike. REA filed suit in federal district court seeking an injunction against the strike. BRAC counterclaimed requesting a status quo order.

The question of the strike's validity turns upon the determination of whether the underlying dispute is "major"—in which case the strike is permissible—or "minor"—in which circumstance BRAC cannot strike but must proceed with REA to arbitration before the National Railroad Adjustment Board. After a full evidentiary hearing and in an unpublished opinion the District Court held the dispute to be major. We reverse.

For many years REA has engaged in hauling freight. Initially its activities were carried on exclusively by rail, but in more recent years rail operations have become impractical and uneconomical. REA has, therefore, shifted more and more of its freight operations from rail to over-the-road (OTR) truck runs.

At present the parties are governed by a collective bargaining agreement effec-

tive since January 1, 1967. In apparent recognition of changing times, the contract to some extent undertook to provide for a smooth transition from rail operations to OTR runs. Rule 8 of the agreement provides:

> By agreement with the General Chairmen in the Districts in which over-the-road truck runs are operated, the provisions of Rules 4, 5, 6 and 9 may be suspended and special provisions will be established governing hours of service, overtime, and basis of pay of over-the-road truck runs.

In an attempt to explain more thoroughly the meaning and force of Rule 8, the parties also agreed to the following "Memorandum of Understanding" as to the application of the rule:

> It is agreed and understood that under the application of Rule 8 existing over-the-road truck runs will continue to operate in accordance with Article IX of the September 1, 1949 Agreement. Arrangements concerning operation of new runs will be worked out by agreement between the General Chairmen and Company representatives except that: * * * *

> In the event of failure to make an agreement concerning the operation of a new run within forty-five (45) days after notice is given to the General Chairman or General Chairmen representing the employees to be affected, the matter may be referred by either party to final and binding resolution in accordance with Sections 3 and/or 7 of the Railway Labor Act, as amended. The issues submitted for such determination shall not include any question as to the right of the Company to establish the run but shall be confined to the manner of implementing the run.

Prior to the dispute which gave rise to this litigation, REA and BRAC had been able to agree upon all changes in working conditions necessary to implement a substantial number of OTR runs. At first "slip-seat" runs were instituted; that is, with respect to a run between terminals such as Philadelphia and Boston a truck

would leave each terminal traveling toward the other. The two trucks would meet at a prearranged point approximately midway between the two terminals, exchange trailers, and return to their home bases.

The drivers were paid a fixed amount per round trip. For several reasons slip-seating was inefficient. In the words of the District Court,

> If one driver broke down or was unable to make the switching point on time, the other driver had to waste time awaiting his arrival. The time involved in switching operations was also lost, and REA found that, at least in some instances, the fixed "trip rate" agreed upon did not permit them to always get a full eight hours' work for the equivalent of eight hours' pay.

As a consequence of such shortcomings, REA and BRAC began renegotiating the operation of the OTR runs. The restructuring usually involved the elimination of the slip-seat arrangement and provided for a through run by one truck. Necessarily changes had to be made in layover procedures, hours of service, and rates of pay. All such matters were agreed upon on a run-by-run basis. During the existence of the 1967 contract, some 700 runs were restructured in this fashion. At the same time rail operations were continuing to dwindle, and OTR runs were substituted for inefficient rail routes. Changes in working conditions which arose on account of the substitution of an OTR run for a rail route were again worked out on an ad hoc basis for each run.

In the fall of 1970, REA proposed to substitute an OTR run for an existing rail run in the northeastern United States and to restructure 16 existing truck runs in the same geographical region. With respect to this proposal, the parties were unable to reach an accord on rates of pay, layovers, and changes in seniority and domicile rights. After lengthy negotiations and on April 13, 1971, REA served notice that it intended unilaterally to institute the proposed changes. The union denied the existence of such power and contended that since the proposals affected rates of pay and working conditions a major dispute was involved within the meaning of the Railway Labor Act. Accordingly, said the union, the changes could be made only by mediation pursuant to section 6 of the Act or by agreement. The union therefore served section 6 notices seeking to invoke the jurisdiction of the National Railroad Mediation Board. REA countered, stating that the dispute was minor, and refused to submit to mediation.

On April 19, 1971, as the date approached on which implementation was to occur, BRAC called a strike. Two days later REA filed its complaint in the United States District Court for the Northern District of Georgia. That court issued a temporary restraining order enjoining the strike, compelling the parties to negotiate further, and allowing REA to implement the disputed changes at its own risk pending a full hearing. REA did implement the changes.

Several weeks later, after a full evidentiary hearing, the District Court determined that the dispute was indeed major, and accordingly held that the union was automatically entitled to a status quo order, that is, an injunction forbidding REA's continued implementation of the runs. But rather than restoring the status quo at that point, the court stayed its order pending appeal. The court announced the following rationale:

> Though not called upon to do so, the court, after hearing the evidence in this case, expresses the opinion: (1) that, in the long run, the making of the changes proposed by the plaintiff here (as distinguished from the manner in which they were proposed and made) is probably in the best interest of both parties; and (2) that the defendant union probably has no serious objection to them per se, provided only that the manner of their implementation can be agreed upon. In view of these opinions the court has ordered restoration of the status quo most reluctantly and only because it felt compelled to do so. The court therefore

recommends to the parties that, if they agree with these conclusions, they proceed with all haste to attempt to reach an agreement. It has also occurred to the court that the conclusions reached in this order may be found to be wrong. If so, much damage may have accrued and many backward steps may have been taken. The court also believes that, pending an appeal, if any, the danger of irreparable injury to plaintiff is greater than to defendant. If the position of defendant is affirmed it can always exact restitution in the end. In view of these considerations, and in order to give the parties time to consider the suggestions made by the court, it is therefore ORDERED that execution of this order be stayed for a period of ten days or until a ruling on any appeal herein, should one be filed.

The question before this court is whether the District Court erred in its determination that the dispute is major. Several consequences flow from that finding. First, with respect to a major dispute, the Act provides that after failure to negotiate an agreement the parties may voluntarily submit the dispute to the National Railroad Mediation Board. 45 U.S.C. §§ 155, 156. If either party refuses, the Mediation Board is without power to decide the dispute or to force the parties to arbitrate, and they are free to resort to self help. *Id.*; Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Finally, upon request by one of the parties, the federal court is required to issue a status quo order. 45 U.S.C. § 156; Detroit & Toledo Shore Line R. R. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). On the other hand, if the dispute is minor the Act provides that upon failure to arrive at a negotiated settlement either party may request that the jurisdiction of the Adjustment Board be invoked. *Elgin, supra.* In such case the nonrequesting party must submit to arbitration, *Id.*; there is no right of self help. *Id.* And the federal court has discretion

either to issue or to refuse to issue a status quo order. *See Detroit & Toledo Shore Line, supra;* Itasca Lodge 2029, of Broth. of Ry. and S. S. Clerks, etc. v. REA, 391 F.2d 657, 8th Cir. (1968); Switchmen's Union v. Central of Georgia Ry. Co., 341 F.2d 213 (5th Cir.), cert. denied, 382 U.S. 841, 86 S.Ct. 41, 15 L. Ed.2d 82 (1965).

■ Major disputes arise over changes in rates of pay, rules and working conditions where the method of change is not provided in the existing labor contract. *E. g., Elgin, supra.* Minor disputes are those regarding the application or interpretation of existing collective bargaining contracts. *E. g.,* St. Louis, S. F. & T. R. Co. v. Railroad Yardmasters, 328 F.2d 749 (5th Cir.), cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748 (1964); Rutland Ry. Corp. v. Brotherhood of Locomotive Eng., 307 F.2d 21 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963).

In this case REA proposed implementation of 17 OTR runs. The parties could not agree on the manner and method of implementation, and upon BRAC's refusal to arbitrate REA unilaterally implemented the runs. As a consequence of such action, various changes in pay basis, hours of service, layovers, domicile, and seniority rights obtained. REA's position is that Rule 8 and its accompanying Memorandum of Understanding make provision for such changes and that accordingly any dispute aising out of the proposed runs is minor. BRAC's view is that by the terms of the Memorandum Rule 8 applies only to changes resulting from implementation of "new runs," and of the 17 runs in issue only one is "new" while the other 16 constitute restructured existing runs. Moreover, BRAC says that even if all 17 of the runs are "new" within the meaning of the Memorandum there is no method prescribed therein for settling disputes over changes in seniority rights, domicile, layovers, and the specific compensation paid drivers as distinguished from the basis thereof.

The District Court accepted BRAC's characterization that neither Rule 8 nor the Memorandum governs restructured OTR runs and found that of the 17 proposed runs 16 were restructured and that as far as those 16 were concerned a major dispute was involved. Put shortly, we cannot agree that 16 of the 17 proposed runs definitely fall without the ambit of Rule 8 and its accompanying Memorandum. In United Industrial Workers etc. v. Board of Trustees, 351 F.2d 183, 188 (5th Cir. 1965), Chief Judge Brown aptly stated the test for determining whether a particular dispute is major or minor:

> At the outset several things may be briefly emphasized. The first is, of course, that if by its terms of reasonable implication therefrom, the collective agreement apparently affords some arguable basis for the action, the interpretation of the contract, the question of who is right—Carrier or Union—is for determination by the Railroad Adjustment Board, a Court having jurisdiction only to mold equitable relief to preserve the status quo pending Adjustment Board decision.

(footnotes omitted).

■ The key word in this test is "arguable." If the court finds an arguable basis it must defer to the expertise of the Adjustment Board. The District Court denied the existence of such a basis, holding, as noted above, that the plain meaning of the Memorandum distinguishes between "new" as opposed to "existing" runs. In our view it is clear that there is no such plain meaning. The first sentence of the Memorandum states:

> It is agreed and understood that under the application of Rule 8 existing over-the-road truck runs will continue to operate in accordance with Article IX of the September 1, 1949 Agreement.

That sentence could mean that no changes in working conditions on runs in existence on the effective date of the contract can be made without negotiation of a new contract unless the runs themselves are restructured, in which case they become "new runs" governed by the special provisions of Rule 8 and of the Memorandum. We in no way intimate that the above interpretation is correct, but merely note that it is arguably so. It may be that the correct construction is that of the District Court, or the possible construction noted above, or one different from either. The true meaning of the Rule and of the Memorandum is the grist of arbitration.

Having found that there is an arguable basis for invoking Rule 8 and its provision for suspending the terms of Rules 4, 5, 6 and 9, we find that any dispute over hours of service (Rule 4), basis of pay (Rule 9), holidays (Rule 6), and overtime (Rule 5) arising out of implementation of the 17 proposed runs is minor.

■ BRAC falls back to the position that even if Rule 8 is applicable it does not contemplate changes in seniority, domicile, layovers, and specific compensation as distinguished from a basis thereof. The District Court did not reach this issue. We again point out that controversy over such changes constitutes a minor dispute if provisions for settling such a dispute are arguably contained within the collective bargaining agreement. Rule 8 establishes the method by which changes in rates of pay, overtime and hours of service are to be made when such are called for in connection with implementation of a new OTR run. With respect to the dispute over compensation, we hold that changing from a "trip rate" to an "hourly rate" is arguably a change in basis of pay within the scope of Rule 8. In regard to changes in seniority and domicile Rule 12 [1]

---

1. Rule 12(a) provides in full:
   "(a) This Agreement recognizes that two or more offices or departments may be consolidated and/or positions or work

involving a position may be transferred from one seniority district to another after conference and agreement between the Management and the duly accredit-

(Transfers and Consolidations) arguably applies. That rule provides a method (similar to that in Rule 8) for settling seniority disputes arising out of the transfer of "positions . . . from one seniority district to another. . . ."[2]

Moreover, the Memorandum of Understanding as to the applicability of Rule 8 states that the procedure for establishing "[a]rrangements concerning operation of new runs" is set out therein. Arguably the word "arrangements" includes seniority, domicile, layovers, and compensation. Therefore, any dispute over such arrangements is minor.

■ In sum, all changes which result from implementation of the 17 runs are arguably governed by Rule 8, by its accompanying Memorandum, or by Rule 12. Accordingly, the entire dispute is minor.[3]

REA asks that this court issue an arbitration order. The parties, by their action leading up to this litigation, have made it clear that there is no possibility of a negotiated settlement. Since the dispute is minor, REA has the right to institute compulsory arbitration. To ensure that arbitration is had forthwith we direct the court below to vacate its finding that the dispute is major and to issue an order to arbitrate. The District Court was careful to point out that a status quo order rescinding REA's unilateral implementation of the 17 proposed runs might cause far greater irreparable harm to REA than to BRAC. We agree. Having found the dispute to be minor, issuance of a status quo order becomes discretionary. *See Detroit & Toledo Shore Line, supra*; Itasca Lodge 2029, of Broth. of Ry. and S. S. Clerks, etc. v. REA, *supra*; Switchmen's Union

ed representatives of the employees. In the event of failure to make an agreement within sixty (60) days after notice is given to the General Chairman or General Chairmen representing the employees to be affected by the contemplated change, the matter may be referred by either party to final and binding resolution in accordance with Sections 3 and/or 7 of the Railway Labor Act as amended. The issues submitted for such determination shall not include any question as to the right of the Company to make the change but shall be confined to the manner of implementing the contemplated change."

In addition subsections (b) through (e) of the Rule contemplate and provide for changes in domicile by employees who move in order to protect their seniority rights.

2. That Rule 12 arguably governs any change in seniority rights caused by implementation of the 17 runs here at issue is best shown by example. Prior to REA's proposal there was an OTR run between Philadelphia and Pittsburg with slip-seating occurring at Breezewood, Pennsylvania, the boundary line between the Philadelphia and Pittsburg seniority districts. Thus under the old run a driver with seniority in Philadelphia handled the leg from Philadelphia to Breezewood while another driver with seniority in Pittsburg drove the other leg. Under the REA proposal, all drivers would be based in Pittsburg. Arguably,

the "position" (within the meaning of Rule 12) of the driver from Philadelphia to Breezewood has been transferred to the Pittsburg seniority district. Pursuant to Rule 12, then, all the drivers formerly based in Philadelphia would have the right to transfer to Pittsburg and to maintain their seniority rights. Accordingly, any seniority dispute over implementation of the Philadelphia-Pittsburg run is minor. The same logic applies to the other runs.

3. The District Court after finding that the dispute was major, reasoned further that "even if this [finding] * * * is wrong [REA] nevertheless cannot prevail on its contention that the agreement (memorandum) authorizes what it has unilaterally done." This statement by the trial judge does not relate to the question of whether the dispute is major or minor but rather to the issue of REA's power to implement the new runs upon BRAC's refusal to arbitrate even assuming BRAC was required to arbitrate. Having found that the entire dispute is minor, in that all of the changes incumbent on implementation of the proposed runs are arguably governed by contract provisions, we find authority for REA's action in Board of Locomotive Firemen and Enginemen v. Southern Pacific Co., 447 F.2d 1127 (5th Cir. 1971), and in St. Louis, S.F. & T. Ry. Co. v. Railroad Yardmasters, 328 F.2d 749 (5th Cir.), cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748 (1964).

v. Central of Georgia Ry. Co., *supra.* Therefore, on the basis of the reasons set out by the District Court in support of its stay of its own status quo order pending this appeal, we direct that the entire status quo order be vacated.[4]

Reversed and remanded with directions.

AINSWORTH, Circuit Judge (dissenting):

The principal issue here is whether the labor dispute between the parties is a major or minor dispute. I differ with the majority and agree with the District Court (Judge Edenfield) that the present case involves a major dispute. I, therefore, would affirm the District Court for the reasons pointed out in Judge Edenfield's well-reasoned, written opinion, which reads in pertinent part as follows:

As in many of these cases, all parties concede that a determination of the single question whether the dispute here is a "major" dispute on the one hand or a "minor" dispute on the other will be largely determinative. A major dispute, of course, includes disputes over rates of pay, rules, working conditions to be included in new contracts, or changes to be made in existing contracts. The Railway Labor Act also provides (45 U.S.C. § 152 (Seventh)) with respect to major disputes, that "no carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." Section 156 in turn provides that the provisions in the agreement regarding rates of pay, rules, and working conditions shall not be altered until the con-

troversy has finally been acted upon by the Mediation Board.

Minor disputes on the other hand are those regarding the mere interpretation or application of existing collective bargaining agreements. Where a minor dispute is involved, compulsory arbitration before the National Railway Adjustment Board is required. For a general discussion of the difference between major and minor disputes, *see* Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. *See also* St. Louis, S. F. & T. Ry. v. Railroad Yardmasters of America, 328 F.2d 749 (5th Cir. 1964), where Judge Tuttle discussed a minor dispute as one in which the respective contentions of the parties are based on existing agreements regarding rights that have already accrued.

The court finds, and indeed all parties virtually agree, that the changes which the carrier proposed to unilaterally implement in this case, standing alone, would clearly involve a major dispute[2] and that, nothing else appearing, the carrier could not put them into effect until there had been either an agreement with the union or the controversy had been finally acted on by the Mediation Board. 45 U.S.C. § 156, *supra.* Of course this court realizes that not every issue between the carrier and the union relating to "rates of pay, rules or working conditions" requires that § 6 be invoked. It must be invoked, however, where a unilateral change with respect to these matters, not provided for by contract, is proposed. *See St. Louis, S. F. & T. Ry., supra* at 753.

The plaintiff carrier, however, seeks to avoid the conclusion that a major dispute is involved on the ground that the changes it proposed were either expressly au-

---

4. The Detroit & Toledo Shore Line case in no way forbids our denial of status quo. That case, as Judge Ainsworth has noted in United Transportation Union v. Georgia Railroad, 452 F.2d 226 (5th Cir., 1971) mandates "that the status quo be maintained between labor and management, the union and the railroad here, while a 'major dispute' between the parties is being resolved in accordance with

the terms of the [Railway Labor] Act." In this case we have found a "minor dispute," and accordingly we are free to refuse a status quo order.

2. It is beyond question under the evidence that these changes directly altered rates of pay, working conditions, and seniority districts of the drivers involved.

thorized, or at least arguably authorized, under the existing contract between the parties, and that the provisions of the agreement together with the last clause of § 2, Seventh, of the Railway Labor Act (45 U.S.C. § 152, Seventh), *supra*, permit it to unilaterally make the proposed changes irrespective of what kind of dispute might otherwise be involved. It also asserts that the dispute in any event can only be a minor one since it only involves an interpretation of the bargaining agreement.[3]

With respect to all of the questioned runs, save two,[4] the court simply cannot accept plaintiff's contentions that the changes unilaterally proposed (and now unilaterally implemented) by the carrier are expressly or even arguably permitted under the agreement between the parties or under the RLA. Instead, the court concludes that a major dispute is involved, that the carrier had no authority under the Act to implement these changes without either mediation or agreement with the union, and that further implementation must be enjoined and the status quo restored. Detroit & Toledo Shoreline R. R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

It might be well at this point to capsulate plaintiff's contentions and to assign the reasons why the court believes they are untenable. Reduced to bare bones, the plaintiff's argument runs like this:

(1) Section 2, seventh, of the RLA (45 U.S.C. § 152, Seventh) permits a carrier to change rates of pay or working conditions, "as embodied in agreements" either as prescribed in 45 U.S.C. § 156 or "in the manner prescribed in such agreements . . ." ;

(2) the changes which it proposes are either prescribed (embodied) in the existing agreement or at least are "arguably" so ;

(3) if the changes are expressly authorized (embodied) in the existing agreement they are also authorized under the foregoing section of the RLA ;

(4) if the changes are only "arguably" authorized or embodied in the existing agreement an interpretation becomes necessary to determine whether they are so authorized and embodied, and any question of interpretation of the contract is ipso facto classified by the Act as only a minor dispute (whatever it might otherwise be), and therefore compulsory arbitration under either section 3 of the Act, rather than mediation, is all that is required. RLA § 3(i), 45 U.S.C. § 153(i).

The court agrees with plaintiff that the existing agreement may at least "arguably" authorize compulsory arbitration where only *entirely new* over-the-

---

3. REA vigorously relies on the recent case of Northwest Airlines, Inc. v. Airline Pilots Ass'n., Intl., 442 F.2d 251, 8th Cir., 1971. As REA contends, this case does indicate that if a dispute between a carrier and a union arguably arises out of an interpretation of the collective bargaining agreement, the dispute should be submitted to arbitration. In *Northwest*, the Circuit Court found that a "no strike" clause must be implied from a study of the entire collective bargaining agreement and the history of the negotiations between the parties. The Court then decided that the union strike arguably came within this implied no-strike clause, and the dispute should thus be submitted to arbitration. The *Northwest* case presents nothing new. As long ago as 1964, Judge Tuttle held a

dispute to be minor when he found the carrier had raised "a substantial issue as to the interpretation of the contract. It is not a fictitious or merely colorable issue. Before a tribunal can decide that the terminations at issue were not justified, it must construe the language of Rule 16(e)." St. Louis, S.F. & T.Ry. v. Railroad Yardmasters of America, 328 F.2d 749 (5th Cir. 1964). We do not reject the basic proposition propounded by plaintiff. Rather, we feel plaintiff cannot come within its proposition.

4. These were entirely new runs, not existing runs which were to be restructured. As shown later, there may or may not be a difference.

road "runs" are proposed to be instituted; *but out of 17 runs in controversy only one falls in this category* while as to at least 16 others what is proposed by plaintiff is not the institution of a *new* run but a *change in rates of pay and conditions of employment on an existing* over-the-road run. With respect to these 16 proposed changes the court cannot agree that they are either "expressly" or even "arguably" authorized by or embodied in the existing agreement; and, being neither expressly nor arguably so authorized, these changes can only be made in accordance with 45 U.S.C. § 156. In short, as to them, a major dispute is involved and the court does not have to resort to a forbidden "interpretation" of the Act[5] to arrive at this conclusion. All it has to do is read and apply the plain and unambiguous language of Rule 8 of the agreement and the "Memorandum of Understanding" adopted in explanation thereof.[6]

Rule 8 of the existing labor agreement begins by saying that *"By agreement with the General Chairmen"* certain other rules may be suspended and special provisions established governing hours of service and basis of pay on over-the-road runs. *But here there has been no "agreement with the General Chairmen"* as the rule requires. Instead, the company proposes to make the changes, and indeed has made them, unilaterally. Rule 8 itself clearly does not authorize or justify plaintiff's action in making the changes, either "arguably" or otherwise.

But plaintiff then relies on the "Memorandum of Understanding" as to the "Application of Rule 8" (p. 42 of the agreement) and after citing the provisions of the Memorandum authorizing submission of the issues to future compulsory arbitration in the event of failure to agree, it relies particularly on the next sentence (the last sentence of the second full paragraph of the Memorandum), which says:

"The issues submitted [to future arbitration] . . . shall not include any question as to the *right* of the company to *establish* the run but shall be confined to the manner of implementing the run."

Plaintiff strenuously urges that this sentence applies to both the creation of entirely *new* runs (established to replace rail service) and to the restructuring of *existing* runs. In fact it says that both are the same—that a restructured existing run *is* a new run—and that pursuant to this sentence it can unilaterally restructure old runs, change rates of pay, change working conditions, relocate employees, and violate existing seniority districts at will, provided only that it arbitrate the changes later.

At the risk of indulging in a forbidden "interpretation" of the agreement the court could not accept this reading of what appears to be plain language in any event. As we read the Memorandum it plainly distinguishes between *new* runs and *existing* runs and treats each differently, separately, and in the disjunctive. By the express language of the Memorandum its first sentence relates only to existing runs and the balance of the Memorandum, including the sentence relied on by plaintiff, relates only to the new. This sentence, therefore, cannot be applied to changes in an existing run.

But even if this be a forbidden judicial interpretation of the agreement (memorandum), and even if such interpretation is wrong, plaintiff nevertheless cannot prevail on its contention that the agreement (memorandum) authorizes what it has unilaterally done. This for four succinct reasons:

*First:* Conceding that under section 2, Seventh, of the RLA, *supra,* work-

---

5. *See* Aaxico Airlines, Inc. v. Airlines Pilots Ass'n. Intl., 331 F.2d 433 (5th Cir. 1964).

6. Though the court cannot interpret, the court can read the plain English in the contract. *See* discussion in *St. Louis S.F. & T.Ry., supra.*

ing conditions and rates of pay "as embodied in agreements" can be changed "in the manner prescribed in such agreements", the agreement (memorandum) here does not even mention working conditions or rates of pay and hence there *is* no agreement as to *how* they shall be changed. Certainly they cannot be so changed where the agreement is silent. Detroit & Toledo Shoreline R. R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).[7] Finally, even reading the memorandum as plaintiff reads it, it nowhere says or suggests that under any circumstances the carrier can implement the run *before* the proposed arbitration, as was done in this case.

*Second:* If the agreement (memorandum) *did* mention working conditions and rates of pay, either expressly or impliedly (which it does not), and if it *did* provide for implementation first and arbitration later, it still would not suffice. It would be only an agreement to make an agreement in the future. This is presently no "agreement" at all. At least it is certainly not the kind of agreement contemplated in section 2, Seventh, of the Act. To hold otherwise would, as to major disputes, do away with the Act by substitution and postponement.

*Third:* If the agreement (memorandum) does propose what plaintiff contends (as set forth in the preceding paragraph) such provision would be void and unenforceable as contraven-

ing and reversing the order of procedure so carefully prescribed by Congress for major disputes, and as contravening the mandate of Congress, several times repeated, that existing working conditions and rates of pay shall be changed only after attempted section 7 arbitration, not before. In short, it would eliminate the requirements of the Act respecting maintenance of the status quo. *See* Detroit & Toledo Shoreline R.R. v. United Transportation Union, *supra.*

*Fourth:* If the agreement (memorandum) means what plaintiff contends, and if such provision were allowed, it would also contravene the mandate of Congress by making arbitration of major disputes compulsory, whereas section 5, first, of the RLA specifically and purposely makes such arbitration voluntary (*see* Detroit & Toledo R.R. v. United Transportation Union, *supra*). Such change would therefore take negotiations respecting changes in working conditions and pay out of the hands of the parties and turn them over to arbitrators, thereby allowing the arbitrators, in effect, to make a new contract between the parties.

In short, what plaintiff proposes is to do away with the procedures prescribed by the RLA by substitution. If such action were allowed the whole scheme of the Act would be set at naught and all the evils which it seeks to eliminate revisited upon the parties and the public.

7. This case is not like Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962), cert. denied 372 U.S. 954, 83 S.Ct. 949, 9 L. Ed.2d 978 (1963), on which REA so heavily relies. In *Rutland*, the railroad unilaterally rescheduled train runs with a resultant loss of employment and displacement of personnel. Though there was no express provision in the collective bargaining agreement granting the railroads the right to unilaterally reschedule runs, the Court found that the past history of relations between the parties might have made the right to reschedule runs an implicit part of the managerial prerogative clause of the collective bargaining agreement. Here, the past history of the REA and BRAC conduct involving the restructuring of runs overwhelmingly supports the conclusion that REA has no such right to unilaterally reschedule runs, thus changing working conditions. The testimony is that in recent years between 600 and 700 runs have been restructured *after* negotiation and agreement between the parties. Thus the history of the parties' relations, like Rule 8, indicates that the provisions regarding basis of pay and other working conditions may be altered only by agreement, not by unilateral action.

As the Supreme Court has said in a somewhat similar context:

"The processes of bargaining and mediation called for by the Act would indeed become a sham if a carrier could unilaterally achieve what the Act requires be done by the other orderly procedures." Brotherhood of Railway, Airline & Steamship Clerks etc. v. Florida East Coast R.R., 384 U.S. 238, 247, 86 S.Ct. 1420, 1425, 16 L.Ed. 2d 501.

Accordingly, I respectfully dissent.