**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Plaintiff,**

v.

**NATIONAL MEDIATION BOARD, Defendant,**

and

**Southern Pacific Transportation Company, Rule 19 Defendant.**

Civ. A. No. 89–1536–LFO.

United States District Court, District of Columbia.

Sept. 5, 1989.

As Corrected Oct. 24, 1989.

Mulholland & Hickey, Michael S. Wolly, Erick J. Genser, Washington, D.C., for plaintiff.

Robert S. Bogason, Gen. Atty., Southern Pacific Transp. Co., San Francisco, Cal., Richard T. Conway, I. Michael Greenberger, Shea & Gardner, Washington, D.C., for defendant Southern Pacific Transp. Co.

A. Scott Simpson and Theodore Hirt, Dept. of Justice, Federal Programs Branch, Civ. Div., Washington, D.C. (Ronald M. Etters, General Counsel, Nat. Mediation Bd., of counsel), for defendant Nat. Mediation Bd.

## MEMORANDUM

OBERDORFER, District Judge.

The International Association of Machinists and Aerospace Workers ("IAM" or "the Union") and the Southern Pacific Transportation Company ("the Southern Pacific" or "the Railroad") have been involved in a labor dispute since 1977. Their dispute has been in arbitration before the National Mediation Board ("NMB" or "the Board") since 1983. IAM brought this action seeking injunctive relief requiring the NMB to terminate mediation. All parties have moved for summary judgment, and the motions have been argued.

### I.

Labor-management disputes in the railroad industry are governed by the Railway Labor Act, 45 U.S.C. §§ 151–88 ("the Act"). The primary purpose of the Act is to protect the public from the crippling effects of interruptions of interstate commerce. *See Detroit & Toledo S.L.R.R. v. United Transp. Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (*"Detroit & Toledo "*). The Act, however, does not effectuate its purpose by regulating the forms of self-help available to parties.

Rather, the Act establishes an elaborate process of negotiation, mediation, voluntary arbitration, and conciliation, and imposes on the parties an obligation to "make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies [are] being exhausted." *Id.* at 149, 90 S.Ct. at 298.

The Act's procedures for resolving major disputes have been summarized by the Supreme Court as follows:

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.

*Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); *see* 45 U.S.C. §§ 152 Second, Seventh, 155 First, 156, 157, 160. Once this process is exhausted—*i.e.* the Board has terminated mediation, the parties have rejected arbitration, and presidential review is complete—the parties may resort to unrestricted economic warfare. *See International Ass'n of Machinists & Aerospace Workers v. National Mediation Bd.*, 425 F.2d 527, 533 (D.C.Cir.1970) (*"Machinists"*).

## II.

A short history of the mediation in this case is necessary to evaluate IAM's request for termination. In March 1977 and October 1981, IAM served bargaining proposals on Southern Pacific under section 6 of the Act. *See* 45 U.S.C. § 156; Declaration of Charles E. Lamb ("Lamb Decl.") at ¶¶ 12, 14; Declaration of E.B. Kostakis ("Kostakis Decl.") at ¶ 3. Although the exact parameters of the dispute are not spelled out in the record, the notices sought comprehensive changes in the parties' existing agreement and involved numerous discrete issues. *See* Lamb Decl. at ¶¶ 12–16. From April 1977 to February 1983, the parties met on five separate occasions and unsuccessfully attempted to bargain to a settlement. In September 1983, IAM requested NMB mediation under section 5 of the Act. *See* 45 U.S.C. § 155 First; Lamb Decl. at ¶¶ 13, 17–18; Kostakis Decl. at ¶¶ 4–5.

The first mediation session was conducted by Mediator Richard Cosgroves on November 15 and 16, 1983. The parties then met on their own on November 29, 1983, without success. *See* Lamb Decl. at ¶ 19; Kostakis Decl. at ¶¶ 6–7. In 1984, the Board assigned Mediator Charles Barnes to the case, and he conducted the second mediation session on April 17 and 18, 1984. *See* Lamb Decl. at ¶ 20; Kostakis Decl. at ¶ 8. No agreement resulted, and on May 9, 1984, IAM requested that the Board terminate mediation. The Board, however, elected to continue mediation. *See* Lamb Decl. at ¶ 20.

The third mediator assigned to the case, Joseph Smith, conducted the third, fourth, fifth, and sixth mediation sessions on August 15 and 16, October 16, 17, and 18, and December 11, 1984, and January 22 and 23, 1985. *See* Lamb Decl. at ¶¶ 21–22; Kostakis Decl. at ¶ 10. Claiming that "the efforts of the NMB have been fruitless," IAM again requested that the Board terminate mediation in June 1985. *See* Lamb Decl. at ¶ 23; Kostakis Decl. at ¶ 13. A seventh mediation session was held on October 29

and 30, 1985, following which, the Board recessed mediation. *See* Lamb Decl. at ¶¶ 24–27.

After October 1985, neither party requested further action by the Board until IAM made its third request to terminate mediation in October 1988. *See* Lamb Decl. at ¶ 28; Kostakis Decl. at ¶ 11. During this three year period, the parties met without a mediator on three occasions, but they did not reach any agreement. *See* Kostakis Decl. at ¶ 12. Following IAM's October 1988 request to terminate, the Board assigned a fourth mediator, Joseph Ingles, who conducted the eighth mediation session on January 18, 1989. *See* Lamb Decl. at ¶¶ 28–29; Kostakis Decl. at ¶¶ 13–15. On April 3, 1989, IAM made its fourth request to terminate the mediation, and the Board responded by scheduling another session with a new mediator, Thomas Green. *See* Kostakis Decl. at ¶¶ 16–20. IAM filed its complaint in this action on May 26, 1989.

Subsequent to this filing of this action, the parties have attended mediation sessions on July 6 and 7, July 12 and 13, and August 2 and 3, 1989. *See* Supplemental Declaration of C.E. Lamb ("Lamb Supp. Decl.") at ¶ 1.

### III.

The Supreme Court has recognized that "the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Brotherhood of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees v. Florida E.C.R.R.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). The crucial element in this "almost interminable" process is mediation before the National Mediation Board. *See Detroit & Toledo*, 396 U.S. at 149, 90 S.Ct. at 298. Given the "sensitive and delicate" nature of the Board's task, the Board has broad discretion in deciding whether to terminate mediation, and that decision is entitled to great judicial deference. *See Delaware & Hudson Ry. v. United Transp. Union*, 450 F.2d 603, 608 (D.C.Cir.1971).

The seminal and controlling case on judicial review of NMB decisions is *International Association of Machinists and Aerospace Workers v. National Mediation Board*, 425 F.2d 527 (D.C.Cir.1970). In *Machinists*, the Board continued mediation "although 97 issues remained unresolved after 48 mediation sessions and 179 hours of talk...." *Id.* at 530. The district court ordered the Board to terminate mediation, concluding that its continued refusal to do so was "patently arbitrary." *Id.* The Court of Appeals reversed, holding that the district court did not show sufficient deference to the Board's judgment. *Id.* at 542–43. The court, however, refused to give Board decisions "absolute immunity from judicial inquiry," stating that the federal judiciary may intervene if "the Board continues mediation on a basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable, notwithstanding the lack of any genuine hope or expectation that the parties will arrive at an agreement." *Id.* at 537. The court went on to establish an objective standard, which mandates deference to the Board if "there is a reasonable possibility of conditions and circumstances (including attitudes and developments), available to the Board, consistent with the objective facts, sufficient to justify the Board's judgment that the possibility of settlement is strong enough to warrant continuation of the mediation process." *Id.* at 541. Finally, the court admonished that only an "extraordinary and exceptional situation" in a "rare and unusual case" would justify judicial intervention. *Id.* at 542–43.

Since the *Machinists* decision, only one court in this circuit had encountered such a "rare and unusual case." In *Local 808, Building Maintenance, Service and Railroad Workers v. National Mediation Board*, No. 88–1730, —— F.Supp. —— (D.D.C. May 19, 1989) ("*Local 808*"), Judge Harold Greene ordered the Board to terminate mediation in a dispute under a section 9A of the Act, which applies only to commuter railroads. *See* 45 U.S.C. § 159a. Judge Greene articulated four reasons for his decision: (1) the dispute had been in

mediation an unusually long time for section 9A disputes—22 months; (2) the burden of the long delay fell entirely upon the union; (3) one of the Board members had stated that he disliked the section 9A procedure (which requires a "cooling off" period before the parties may resort to self-help); and (4) absolutely nothing appeared to be occurring while the dispute was in mediation. *See* Slip op. at 11–15. Judge Greene's ruling in *Local 808* is presently on appeal. On July 25, 1989, the Court of Appeals granted NMB's motion for a stay pending resolution of the appeal. *See* Order, *Building Maintenance, Service and Railroad Workers v. National Mediation Board*, 888 F.2d 1428 (D.C.Cir.1989).

## IV.

■ The Board claims that, despite the length of the mediation in this case, settlement remains possible. Under the *Machinists'* standard, the Board is entitled to the presumption "that if any state of facts might be supposed that would support its action, those facts must be presumed to exist." *Machinists*, 425 F.2d at 540. Moreover, parties challenging the Board's decision may only rely on "objective facts." *Id.* at 541. In support of its motion, IAM asserts the basic facts regarding the length and apparent futility of the mediation: the dispute has gone through eleven mediation sessions over almost six years with five different mediators and no agreement is in sight. Beyond asserting that "employee protection" is an important unresolved issue, however, IAM has not specified the details of the negotiations. IAM has presented few objective facts about the issues that have been discussed, the issues that remain unresolved, and the parties' negotiation posture as to the unresolved issues. The Union offers simply the "opinion" of its chief negotiator that further mediation will be fruitless. *See* Kostakis Decl. at ¶ 23.

Defendants, on the other hand, offer several "objective facts" that they claim justify continued mediation. First, defendants claim that, although the mediation in this case has been undeniably lengthy, the length has not been extraordinary. *See* Declaration of Charles R. Barnes ("Barnes Decl".) at ¶¶ 5–6. Moreover, for three years from 1985 to 1988 nothing happened because neither party requested further mediation. *See* Barnes Decl. at ¶ 7(e); Lamb Decl. at ¶ 10. Second, defendants claim that the Southern Pacific's financial and corporate status has been uncertain during much of the mediation. The Southern Pacific's holding company was recently sold, however, so the Railroad's future is more certain and its finances are healthier, making successful mediation more likely. *See* Barnes Decl. at ¶ 7(a), (b). Third, the Railroad made a detailed settlement proposal in 1985 and stands ready to discuss that proposal (or a counter proposal) issue-by-issue. *See* Lamb Decl. at ¶¶ 24–27. Fourth, the Board has appointed a new mediator, Thomas Green, who it claims has "extensive railroad industry collective bargaining experience[,] has been known to these parties and their principle negotiators for decades," will add a fresh perspective to the now stale dispute. *See* Barnes Decl. at ¶ 7(c). Finally, the railroad reports that in mediation sessions conducted after IAM filed its complaint, the parties have successfully narrowed the dispute to three issues. *See* Lamb Supp.Decl. at ¶ 11.

Defendants' simplest and most forceful argument, however, is that the Board's decision in April 1989 not to terminate mediation was reasonable given that only one mediation session had occurred after a three-year hiatus. As far as the Board was concerned, the dispute had been dormant from October 1985 until October 1988 when IAM requested termination. After the Board conducted a mediation session in January 1989, the Union again requested termination. Defendants assert that, under those circumstances, the Board's decision to schedule another mediation session for June 1989 was reasonable.

The Board's justifications are not entirely convincing. Any dispute that lasts as long as the present one has may seem incapable of voluntary resolution. Never-

theless, given the objective facts [1] and the heavy presumption to which the Board is entitled, the Board's decision not to terminate mediation must be considered, if not reasonable, at least not "completely and patently arbitrary." *Machinists*, 425 F.2d at 537. Judge Greene's reasoning in *Local 808*, while persuasive, is not applicable to these facts, e.g., the mutually agreeable three-year hiatus. Although the mediation in this case has been lengthy and the extended delay burdens the Union, it cannot be said that "absolutely nothing" is happening. *See Local 808*, Slip op. at 14. Consequently, IAM's complaint must be dismissed with prejudice. *See Machinists*, 425 F.2d at 543.

## V.

In its representations and arguments to the Court, the Board has asserted that a strike represents a failure of the Act's purposes. This position oversimplifies the policy of the Act and is contrary to the law of this circuit. In *Machinists*, Judge Leventhal stated:

> The rights of self-help owned by both union and management have been deliberately preserved by Congress, albeit held in temporary abeyance. They survive, available for use when the statutory procedures to promote agreement are exhausted.
>
> They are indeed in a sense symbols of freedom, reminders that even though their occasional exercise and the disorder of industrial warfare may be vexing to the point of distress the underlying freedom is more productive of a healthy and vigorous economy and nation than a structure of economic regimentation and dictated order.

425 F.2d at 536–37. Simply put, self-help at the appropriate point in the statutory process is not an evil; in fact, the threat of damaging economic warfare is essential to encourage good faith mediation.

Plaintiff's complaint will not be dismissed because continued mediation is necessary to prevent a strike; rather, it will be dismissed because the prospect for a voluntary settlement remains. If it appears in the future, however, that the Board is continuing mediation solely to frustrate the Union's right to strike, the Court will not hesitate to intervene. At the present time, the Board's decision to continue mediation is justified, and the Union is therefore not entitled to relief. The dismissal of the complaint, however, does not mean that the Union will not be entitled to relief at some future moment in time. The Union is not precluded from filing another suit (attentive to the strictures of Rule 11) based on the evidence of this record *plus* relevant proof of events during the future course of mediation that distinguish the prospective case from the instant one. *Cf. Machinists*, 425 F.2d at 543 (stating that the complaint should be dismissed "with prejudice").

Accordingly, an attached Order will deny plaintiff's motion for summary judgment and grant defendants' motions to dismiss.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 30th day of August, 1989, hereby

ORDERED: that plaintiff's motion for summary judgment should be, and hereby is, DENIED; and it is further

ORDERED: that defendants' motions to dismiss should be, and hereby are, GRANTED; and it is further

ORDERED: that plaintiff's complaint should be, and hereby is, DISMISSED, without prejudice to plaintiff's filing another suit (attentive to the strictures of Rule 11) based on the evidence of this record *plus* relevant proof of events during the

---

1. The Union claims that the court must limit its inquiry to "the facts existing as of the time the complaint is filed." *Machinists*, 425 F.2d at 542. Defendants claim that the *Machinists* limitation was meant only to exclude evidence of unsuccessful post-complaint sessions. This issue need not be resolved, however, as the Board's decision is justifiable both as of the time the complaint was filed (May 26, 1989) and as of the time the hearing was held in this matter (August 4, 1989).