**DELTA AIR LINES, INC., Plaintiff,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, et. al., Defendants.**

**No. 1:00–CV–3207–WBH.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 11, 2000.

Weyman Thompson Johnson, Jr., William F. Kaspers, Paul Hastings Janofsky & Walker, Walter Brill, Atlanta, GA, John J. Gallagher, phv, Neal D. Mollen, phv, Thomas J. Knapp, phv, Margaret H. Spurlin, phv, Paul Hastings Janofsky & Walker, Washington, DC, for Plaintiff.

Michael E. Abram, Peter D. DeChiara, phv, Michael G. Dzialo, phv, Michael L. Winston, phv, Cohen Weiss & Simon, New York City, Marcus C. Migliore, phv, Washington, DC, James Michael Walls, Nakamura Quinn & Walls, Atlanta, GA, for Defendants Air Line Pilots Ass'n, Intern. ("ALPA"), Delta Master Executive Council ("MEC") of ALPA, officers of Delta MEC: Charles Giambusso, Mark Moore, and James Icenhour.

### ORDER

HUNT, District Judge.

Before the Court is Plaintiff, Delta Air Lines, Inc.'s ("Delta"), Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction. Delta moves the Court to enjoin and restrain the Air Line Pilots Association ("ALPA"), the individually named Defendants, and all others acting in concert with them from engaging in job actions, self-help or other violations of the status quo as defined and prohibited by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 101 *et. seq.* The alleged illegal activity includes a work slowdown, overtime ban including concerted refusals to accept premium time and/or special work assignments ("overtime" work), and other actions intended to cause added expense and/or disruption including increasing taxi-times and fuel burns.[1]

The Court, having considered the Verified Complaint, Motion, declarations, and exhibits submitted in support of the TRO and Preliminary Injunction, the Memorandum and declarations submitted in opposition thereto, and having heard extended oral argument in open court, both in support of and in opposition to the granting of a TRO and Preliminary Injunction, makes the following

**FINDINGS:**

(1) Plaintiff Delta is a common carrier-by-air engaged in the transportation of freight and passengers in intrastate and interstate commerce throughout the United States. Defendant ALPA is a labor organization that is the exclusive bargaining representative of Delta's pilots. The individual Defendants are officers, representatives or subunits of ALPA, or members thereof.

(2) Delta and ALPA are parties to a collective bargaining agreement which sets forth the terms and conditions of employment for over 9,800 pilots employed by Delta. Delta and ALPA commenced their negotiations for a new agreement in September of 1999.

(3) Delta and ALPA have not yet exhausted the "purposely long and drawn-out" bargaining procedures mandated by the RLA. *Bhd. of Ry. and S.S. Clerks v.*

---

1. The Court notes here that the crux of Delta's Motion is the allegation regarding the refusal to accept voluntary overtime work. The only evidence Delta has presented regarding the other alleged illegal activity (i.e. work slowdown, increasing taxi-times and fuel burns), consists of suggestions made by individual pilots via e-mail inciting their cohorts to partake in this type of activity. Delta did not argue this point during the Hearing nor in their pleadings. Nor did Delta present any evidence that this type of "self-help" has actually occurred or that the Defendants were partaking in this activity. For this reason, the Court will only consider the present Motion as it pertains to the pilots' refusal to request voluntary overtime and DENY Delta's Motion as it relates to other alleged violations of the RLA.

*Fla. East Coast Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966); 45 U.S.C. §§ 101 *et seq.* The parties are currently engaged in mediated bargaining and have jointly requested mediation through the National Mediation Board.

(4) There has been a substantial reduction in overtime requests since August of 2000. This reduction dramatically increased throughout November and the first days of December, 2000. The reduction has resulted in the cancellation of hundreds of flights which has seriously inconvenienced tens of thousands of passengers. When compared to the requests for overtime during the same months of 1999, the statistics differ so substantially that the difference can only be explained by the efforts of an undisclosed number of pilots to undermine contract negotiations, seeking leverage for a salary increase.

(5) An undisclosed number of pilots are actively encouraging, through e-mail and other means, the rejection of overtime opportunities. This "no-overtime" campaign has primarily been effectuated through e-mails, many of which rise to the level of intimidation and harassment. These communications include messages encouraging pilots not to respond to phone calls from Delta regarding inverse assignments. Not answering these calls effectively forecloses Delta's ability to staff the flights that are normally staffed by the pilots electing to fly overtime but are suddenly electing not to.

(6) This reduction in requests for overtime is causing harm to Delta and the traveling public. Delta has lost millions of dollars in revenues, rerouting expenses, extra operating costs, and overnight hotel and meal vouchers. Additionally, Delta has suffered loss in the form of good will

and traffic which is immeasurable. The public has suffered loss in time and money from the delays and cancellations which is also immeasurable.

(7) Neither the Union leadership nor the present Delta Master Executive Council ("MEC") of ALPA supports this effort and both have, in fact, counseled against it. The Delta MEC serves as ALPA's coordinating council for Delta pilots. Pilots at pilot bases are represented through ALPA Local Executive Councils ("LECs"), whose elected representatives constitute the Delta MEC.

## ANALYSIS

A party seeking a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury, (3) that its own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not thwart public interest. *Haitian Refugee Ctr., Inc. v. Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991).[2]

### I. Plaintiff's Motion

The Court will address Plaintiff's Motion by first considering the allegations against ALPA and then those against the individual defendants.

### A. Injunctive Relief Against ALPA

Delta avers that ALPA has violated the RLA by encouraging its members to partake in an overtime ban including concerted refusals to accept premium time and/or special (hereinafter collectively "overtime") work assignments. Delta argues that even if the evidence is not sufficient to show direct involvement by ALPA, there is suf-

---

**2.** The parties dispute whether or not the Norris–LaGuardia Act ("NLGA"), 29 U.S.C. §§ 101 *et seq.*, applies to the current Motion. More specifically, Delta argues that the importance of the RLA in protecting the traveling public overrides the NLGA. The application of the NLGA would require clear and convincing evidence that ALPA actually authorized, participated in or, after actual

knowledge, ratified unlawful conduct of its' rank and file members as well as numerous other procedural barriers before any type of injunctive relief could issue. For the purposes of this Motion, the Court is satisfied that the moving party must, at the very least, make a showing of the four factors delineated above.

ficient evidence to show tacit approval by ALPA which is also a violation of the status quo provision of the RLA.

### 1. The RLA

A fundamental purpose of the RLA is "to avoid any interruption to commerce or to the operation of any carrier therein." 45 U.S.C. § 151(a)(1). Sections 5 and 6 of the RLA prohibit all forms of union "self-help," such as striking or engaging in "slowdowns" or "sickouts," until 30 days after the long procedure mandated by the RLA has been exhausted. *Consol. Rail Corp. v. Ry. Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989). The RLA procedures are purposely long and drawn out in the hope that reason will, in time, produce an agreement. *Fla. East Coast Ry.*, 384 U.S. at 246, 86 S.Ct. 1420. Section 2, First of the RLA states that parties to the collective bargaining process must:

> exert every reasonable effort to make and maintain contracts concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such contracts or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152. The Supreme Court has stated that while these procedures are going on, the parties are to "maintain the status quo." *Consol. Rail*, 491 U.S. at 302, 109 S.Ct. 2477.

### 2. Evidence Presented

As proof of its contentions, Delta has presented the following evidence: (1) the overwhelming statistics confirming the drop in overtime requests, (2) an August 22, 2000, resolution from Local Council 47 of ALPA and a letter from the Chairman of that branch dated October 11, 2000, (3) a letter from Mr. Giambusso, (4) an informative flyer produced by ALPA for its members regarding overtime flying, (5) e-mails and other communications from individual pilots.

### Statistical evidence

Delta has submitted an overwhelming amount of statistical evidence that confirms that Delta pilots have dramatically decreased the number of requests they have submitted for overtime flights. For example, the evidence presented shows that while pilots had an average of 2,053 daily requests for overtime flights in November of 1999, they only averaged 1,276 in November of this year. In the first three days of December of 1999 they averaged 1,678 requests while only averaging 503 during those same days in December of 2000. The evidence also confirms that Delta has had to cancel a great deal of flights during this same time period. Delta canceled a total of 10 flights for the month of November 1999 while it canceled 375 flights during November of 2000. In the first three days of December of this year, Delta has already had to cancel 386 flights compared to the first three days of December 1999, when there were no cancellations.[3]

As stated in the Findings listed above, the Court finds that the statistical evidence presented illustrates a deviation that is so substantial, that it can only be explained by the efforts of an undisclosed number of pilots to undermine contract negotiations, seeking leverage for a salary increase and finds this to be credible evidence that an undisclosed number of pilots are engaging in an effort not to accept overtime work.

### Local 47 minutes and letter

Delta presented as evidence the minutes from an August 22, 2000, meeting of Council 047, the Dallas–Fort Worth branch of ALPA, that includes a resolution resolving "that the pilots of Council 47 endorse a green-slip-with-conflict option and/or no

---

**3.** ALPA did point out that the first three days of December of 1999 were weekdays while the same dates of 2000 fell on the weekend which may account for some of the statistical deviation.

overtime flying. This will give all pilots the opportunity for a period of relief from the excessive amounts that we have been doing for far too long" (emphasis in original).

Delta avers that this is direct evidence of ALPA's involvement in and encouragement of the overtime ban.

Delta also presents a letter dated October 11, 2000, from Daryle D. McGinnis, the Chairman for Council 047, sent to the pilots of that area that explains why the ALPA leadership is not partaking in an overtime ban. Delta presents the letter as evidence of what it views as ALPA's role is in the current decline in overtime work: ALPA condemning such action publicly while privately encouraging pilots to participate. The letter states that there is no ALPA sponsored ban on overtime: "there is no MEC associated no-overtime flying ... program." The letter explains that there is no ALPA sponsored ban because it is violative of the RLA. The letter emphasizes, however, that "there is of course a grassroots effort at ... DFW," and suggests that the grassroots effort is legal as long as the union avoids any association with it. The letter recognizes that the August 22, 2000, resolution could be viewed as ALPA action in violation of the RLA and is careful to point out that the resolution

> was not one authorizing or establishing any ... program but rather one telling the MEC that DFW *wanted* to do such a program. There is nothing illegal about wanting to do. That is hugely different from establishing a program. 'Endorsing' is not establishing, nor could any Local Council establish a program opposite direction anyway. (emphasis in original)

### Letter from Mr. Giambusso and flyer from ALPA

Delta places a great amount of weight on a letter to ALPA members dated August 25, 2000, from Mr. Giambusso, Chairman of the Delta MEC. Delta argues that he uses "code words" to incite the overtime ban. Delta alleges that the Chairman

of ALPA, by informing pilots of the manner in which they may legally decline overtime work, encourages ALPA members to refuse to fly overtime. The letter, in its entirety states:

> Dear Fellow Pilot: Over the last year the Delta pilots have demonstrated their commitment and resolve to your union and our contract negotiation goals over and over again. Each time I have asked you to express your resolve to management, you have done so—and management has heard you. The May 2, 2000, informational picketing was a great success and I expect the upcoming rally on September 8 will be an even greater success. These efforts show how effective and powerful unity can be.
>
> Earlier this year, your local representative unanimously directed a recommendation to fly maximum overtime at premium rates. Once again, you came through. Lately, there has been some confusion resulting from individual communications. These are expressions of a lack of patience that seems to be growing within the pilot group. So there is no confusion, I have enclosed a copy of your MEC's unanimous direction on the subject of overtime flying. Until changed, this is what your union is asking you to do. Your continued solidarity and support is the most powerful and effective tool your leadership and Negotiating Committee can have to achieve the goals you set.

Delta characterizes this "disclaimer" and others like it as transparent and false. Delta argues that this letter and other efforts on the part of ALPA pay lip service to the mandates of the RLA all the while it is sponsoring the ban. Delta claims ALPA is masking its participation in the overtime ban by describing it as "individual choices" or "grassroots" efforts. Delta also points to the "Contract Awareness" flyer attached to Mr. Giambusso's letter. This flyer, Delta contends, is a way for ALPA to say "an overtime ban is illegal" out of one side of its mouth while winking and

saying "here is how to effectuate a ban if you choose to do so on your own initiative," out the other. The "Contract Awareness" flyer purports to educate the pilots about overtime flying and overtime pay.[4] The flyer explains the rules, regulations and procedures governing overtime flying and inverse assignments and recommends as follows:

> overtime flying is an individual decision, and no pilot should feel compelled to fly above the cap unless he or she desires to do so. Whether volunteering to fly overtime or being inversely assigned, every pilot should be aware of his or her absolute obligation not to fly when fatigue would prevent safe operation.... Your elected representatives recommend that a pilot who desires to work overtime does so for overtime pay, as most other Delta employees do.

The recommendation goes on to explain the pay rates associated with the different variations of overtime flying and suggests that pilots take advantage of pay above regular rates. Delta argues that this is an example of ALPA saying one thing while encouraging another. Delta claims that the flyer, using phrases such as "individual choice" and making a point to explain the legal manner in which pilots can avoid overtime work allows ALPA to publicly disapprove of the overtime ban while informing its members how to legally participate. Delta goes even further to argue that this informative flyer, when coupled with its timing and the numerous private communications currently being distributed actually acts to encourage the overtime ban.

### Communications from individual pilots

Delta has presented numerous e-mails and other communications from individual pilots that directly encourage involvement in the overtime ban. The e-mails are explicit as to why the overtime ban is encouraged and how to effectuate it which includes ways to ensure that pilots are not available when Delta attempts to inversely assign flights to them. For example, one e-mail from Edwin Havrilla, a former MEC member, dated November 6, 2000, strongly encourages pilots to stop flying overtime immediately because of the timing of the ongoing negotiations (corresponding with Delta's counter proposal and preceding the filing for mediation) and the upcoming holidays, so that their actions will have the most impact.

As stated in the Findings listed above, the Court finds from this evidence that an undisclosed number of pilots are actively encouraging, through e-mail and other means, the rejection of overtime opportunities. This activity includes encouraging pilots not to respond to phone calls from Delta regarding inverse assignments.

### 3. Application of the RLA to the Present Case

#### (i) direct evidence indicating involvement by ALPA

There is no question that there is an ongoing concerted effort on the part of some Delta pilots to refuse overtime work and this Court recognizes that a campaign to ban overtime work or a concerted refusal to work overtime actively sponsored or promoted by a union may violate the RLA. *See ABX Air, Inc. v. Airline Professional Ass'n of the Int'l Bhd. of Teamsters*, C-1-97-812 (W.D.Ohio Nov. 12, 1999). A careful review of the evidence presented, however, reveals that there is insufficient evidence to find that ALPA was directly involved in the overtime ban complained of herein. The only evidence of ALPA's direct involvement comes from the August 22, 2000, DFW Council of ALPA Resolution, resolving to ban all overtime work and a letter from the Chairman of that council acknowledging that there was an ongoing grassroots effort to ban overtime work. That resolution was explained in the letter from the

---

**4.** Rather than reproducing the flyer in the body of this Order, the Court has attached the flyer in its entirety.

Chairman of that Council to its members dated October 11, 2000. The letter explained that the resolution was merely expressing the desires of the Council 47 members, and was not the official position of the chapter. The letter also recognized that there was an ongoing grassroots campaign and speculated that it was "probably legal," but did not in any way promote it and, in fact, did nothing but disavow any official involvement in any such campaign. This evidence is insufficient to make a legal finding that ALPA was directly involved in any movement to ban overtime work. The finding that the evidence is insufficient to connect ALPA to the ban on overtime work is bolstered by the fact that the evidence indicates the ban on the overtime did not really start to take effect until November and December of 2000. It does not logically follow that if this resolution from August incited a ban on overtime work among ALPA members, as Delta would have this Court believe, that the ban did not take effect until November and December, at least three months later. Furthermore, the Court finds that the cases cited by Delta in support of the propositions that a union can be in violation of RLA because of the concerted effort of its members to exercise their right not to work overtime can be distinguished in that they all had evidence indicating direct involvement on the part of the union and some are further distinguished because they involved situations where the defendant unions refused to take any actions disavowing or discouraging the illegal action. *See, e.g., ABX Air, Inc., v. IBT,* C–1–97–812 (W.D.Ohio Nov. 12, 1999) ("refusal of defendant's members [pilots] to bid on open lines of flight [*i.e.,* refusal to work "voluntary" overtime] constituted an illegal strike" under the RLA); *Metro–North Commuter R.R. v. Local 808, Teamsters,* 1988 WL 103359 (S.D.N.Y. Sept. 27, 1988) (concerted ban on overtime enjoined); *National R.R. Passenger Corp. v. Brotherhood of Locomotive Engineers,* 1989 WL 197167 (D.D.C. Oct. 6, 1989) (engineers who refuse to perform training in violation of

established practice are ordered to cease engaging in self-help before exhaustion of major dispute procedures); *Texas Int'l Airlines, Inc. v. ALPA,* 518 F.Supp. 203 (S.D.Tex.1981) (injunction and contempt proceeding where union engaged in slowdown, excessive fuel burn, and sickout); *Pan Am. World Airways, Inc. v. IUFA,* 1981 WL 2367 (S.D.N.Y. July 20, 1981) (injunction against slowdown); *Trans World Airlines, Inc. v. IAM,* 1974 WL 1170 (W.D.Mo.1974) (slowdown activity); *Pan Am. World Airways, Inc. v. Transport Workers Union, Local 504,* —— F.Supp.2d —— (S.D.N.Y. Jan. 1, 1969) (ten minute work stoppage, followed by slowdown, enjoined); *Long Island R. Co. v. Brotherhood of Locomotive Engineers,* 290 F.Supp. 100 (E.D.N.Y.1968) (spurious safety protest enjoined); *United Air Lines v. IAM,* —— F.Supp.2d —— (N.D.Ill.1963) (concerted refusal to work overtime, slowdowns and sit-ins violated duty to exert every reasonable effort to settle all disputes and are enjoined).

### (ii) indirect evidence indicating involvement by ALPA

■ The Court finds that the evidence presented that indirectly demonstrates ALPA's complicity in the overtime ban is too attenuated. Delta would have this Court infer that ALPA is encouraging the ban on overtime work when the evidence demonstrates that ALPA is actively informing its members that it is not involved, actively discouraging the ban and condemning the pilot harassment, while at the same time informing its members of the legal boundaries and ramifications of their actions as well as encouraging them to respect their fellow pilots' choices. The Court finds that Delta is reading too much into the evidence it has presented and finds that this evidence does not support a finding that ALPA was or is involved in the overtime ban. This finding is supported by a letter from Mr. Dave Bushy, Senior Vice President for Flight Operations of Delta, to Mr. Giambusso, dated November 28, 2000, reporting the high

number of flight cancellations during November and thanking him for the "support via code-a-phone and printed material on curbing instances of harassment." Additionally, ALPA has presented numerous e-mails and other communications sent by ALPA condemning the overtime ban, condemning pilots harassing other pilots, and urging ALPA members to respect the individual pilot's right to choose whether or not to work. (Giambusso Decl. ¶ 10).

Therefore, although the Court agrees with Delta that the law would be violated if a union is shown to be involved in a concerted effort to ban overtime work, the Court does not find there to be sufficient evidence to link the overtime ban to ALPA.

### (iii) ALPA's liability aside from evidence indicating involvement

■ Delta next makes the argument that whether or not ALPA is found to be involved in the overtime ban, it has the affirmative duty to end the unlawful activity by its members. Delta cites several of the cases referenced above in support of this proposition: *Trans World Airlines, Inc. v. IAM*, 1974 WL 1170 (W.D.Mo.1974) (slowdown activity); *Pan American World Airways, Inc. v. IUFA*, 1981 WL 2367 (S.D.N.Y. Jul. 20, 1981) (injunction against slowdown). As discussed above, these cases can be distinguished based on the fact that they both had evidence indicating direct involvement on the part of the union and they often involved situations where the defendant unions refused to take any actions disavowing or discouraging the illegal action. These distinguishing characteristics are even more significant here where Delta is asking the Court to order the union to take affirmative action to ensure that their members are not acting in violation of the law, when there has been no finding of union involvement and there is evidence indicating that ALPA has disavowed and discouraged the activity. This Court will not hold a union liable for the unilateral unlawful actions of its members without evidence indicating the union's involvement as was found in the cases

cited by Delta and distinguished by this Court (*see supra*, ¶ (I)(A)(3)(i)). Nor will the Court hold that a union has an affirmative duty to end or prevent the unilateral unlawful activity of its members, especially when there is no finding of involvement on the part of the union and there is evidence that the union has acted to deter unlawful union activity. The facts in this case indicate that ALPA has taken affirmative action not only to inform its members of the possible illegality of their action, but has taken action to discourage unlawful activity.

### B. Injunctive Relief Against the Individual Defendants

Delta avers that the individual Defendants have violated the RLA by engaging in a campaign (1) refusing to request overtime for the sole reason of increasing their bargaining power in the ongoing negotiations, (2) encouraging fellow pilots to partake in the overtime ban, and (3) harassing those pilots that do choose to fly overtime. The Court has found that there is an ongoing concerted effort on the part of Delta pilots to refuse overtime work.

■ The RLA, as described above (*see supra*, ¶ (I)(A)(1)), applies to the union as well as its employees. The RLA states: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements ..." 45 U.S.C. § 152. To this extent, it is clearly a violation of the RLA for the individual pilots to act in such a way so as to be involved in and promote such unlawful activity.

The Court, however, is at a loss, however, as to whom it is to enjoin. Delta has named 49 individual defendants but has not in any form or fashion proven with any specificity the roles these individuals played in the overtime ban. The Court is able to match only one of the individual Defendants to any of the evidence of unlawful activity. Without any specific allegations regarding unlawful activity or evidence implicating the individ-

ual Defendants, the Court is unable to enjoin them even though it has found evidence of illegal activity.[5]

## CONCLUSION

For the foregoing reasons, the Court DENIES the Motion for a TRO and Motion for a Preliminary Injunction. Nothing in this Order should be read to preclude Delta from reasserting a similar claim for relief should circumstances change such that would merit reconsideration.[6] Nor should this Order be read to absolve ALPA membership from liability as this Court has found that there is evidence of activity that is in violation of the RLA even though such activity has not, as yet, been sufficiently connected to the named Defendants.

### *Contract*

### *Awareness* alpa

### 2000

### Optimizing Our Contract Through Education

### # 13—Overtime Flying and Overtime Pay

Many new pilots have been added to the seniority list since we last reviewed the various options the Delta Pilots' Working Agreement (PWA) provides for overtime flying. In this season of understaffed categories and 82–hour caps, all pilots should understand the following information.

***What Is "Overtime Flying"?:*** The PWA allows the company to set the monthly cap between 75 and 82 hours. It requires that regular lines be constructed so as not to exceed the cap. It also requires that Scheduling not assign a reserve any flying once he has reached the cap. Any pilot may submit a request to fly additional open time. The type of request submitted

determines the treatment of pay and credit time for that flying.

***White Slip:*** A pilot projected below the cap for his or her category may submit a request to fly open time at single pay and credit. The pilot will not be paid premium rates or above the cap in that month. Credit earned in excess of the cap must be either deposited in the bank, or carried forward to the next month as a bow wave. Actual payment for W/S overtime flying will be deferred until such time as the pilot does not fill up in a month. (See *When Scheduling Calls*, p. 19, for a full discussion.)

***Green Slip (Regular Line):*** Any regular pilot may submit a request to fly open time on a G/S. If Scheduling does not have sufficient W/S requests or reserves to fly all open time, G/S volunteers will be awarded flying prior to the inverse assignment of non-volunteers. Once a pilot has accumulated credit equal to the cap, all G/S flying will be at double pay, no credit. Flying on a G/S can result in a pilot's receiving pay above the cap in that month, and does not result in any time being available for deposit in the bank, or carrying forward in a bow wave. (See *When Scheduling Calls*, p. 22, for a full discussion.)

***Green Slip (Reserve Line):*** The PWA provides for a reserve pilot to submit a G/S for flying on X-days and/or flying after he has reached the cap. However, because of recent changes to FAR Reserve Rest rules, flying on X-days is often not possible for a reserve due to 24–in–7 conflicts with future on-call days. (See *When Scheduling Calls*, p. 22, for a full discussion.)

***Inverse Assignment:*** After all reserves and volunteers have been awarded flying,

---

5. The Court recognizes that crafting an injunction that prohibits activity found to be violative of the RLA while at the same time recognizing the pilots' rights to choose to work overtime or not and the pilots' First Amendment Rights is a delicate proposition.

6. Obviously the findings in this case are circumscribed by the evidence presented, all in the form of declarations and exhibits. The Court has considered this evidence over the objections of the Defendants who insist that only live testimony should be considered, according to the Norris–LaGuardia Act. 29 U.S.C. §§ 101 *et seq.*

Scheduling will attempt to cover any remaining open time by assigning pilots on their off days, beginning with the most junior pilot available. This method of covering open time is entirely dependent upon the schedulers being able to notify the pilot of his assignment and receive acknowledgment. Pay for I/A flying is similar to G/S pay. (See *When Scheduling Calls*, p. 22, for a full discussion.) responsibilities.

*Green Slip with Conflict:* After Scheduling has exhausted all other volunteers and those pilots who may be inversely assigned without a trip conflict, a pilot may be awarded a GSWC that causes him or her to drop flying already on his or her line in order to fly the open time that Scheduling needs to cover. The pilot will be paid for both trips and receive the pay for the GSWC rotation as single pay, no credit, above the cap in that month. (See *When Scheduling Calls*, p. 22, for a full discussion.)

### Recommendations

First and foremost, your elected local representatives wish to stress that under the PWA, overtime flying is an individual decision, and no pilot should feel compelled to fly above the cap unless he or she desires to do so. Whether volunteering to fly overtime or being inversely assigned, every pilot should be aware of his or her absolute obligation not to fly when fatigue would prevent a safe operation. This is especially important to remember in the event of an I/A received via ACARS or in the jetway upon completion of your scheduled rotation.

**Your elected representatives recommend that a pilot who desires to work overtime does so for overtime pay, as most other Delta employees do.** A green slip will earn premium pay for overtime flying. Flying overtime via a white slip will result in pay at straight rates, and no additional pay, over the cap. When possible, however, it is wise to white slip to or near the cap so as to take full advantage of the double pay; no credit for all-green-slip flying. Any part of the G/S flying that goes toward filling a pilot to the cap is paid just as a white slip is paid.